## ALLEN v. DUNHAM.

### (*Nashville.* February 22, 1893.)

1. GAMING CONTRACTS. *Example of.*

The transaction set out in the Court's opinion, purporting to be a sale of stock by Dunham & Co. to Allen is declared void, as a gaming contract, that may be repudiated by Allen, and the money paid upon it recovered by himself or his wife, or their assignee. (*Post, pp. 258–264.*)

Acts construed: Acts 1883, Ch. 251.

Cases cited and approved: McGrew v. City Produce Exchange, 85 Tenn., 578; 40 U. S. Rep., 499, 508; 33 Am. Rep., 393; 39 Mich., 337.

2. STOCK BROKERS. *Responsible as principals to customers.*

Stock brokers are responsible as principals to customers dealing with or through them. (*Post, p. 264.*)

3. CHAMPERTY AND MAINTENANCE. *Not a defense, when.*

The champerty and maintenance laws afford no defense to defeat a suit by the assignee of the loser's claim to recover of the winner moneys lost in a gambling transaction. (*Post, p. 268.*)

4. COMPOUNDING FELONY. *What is not illegal.*

It is not unlawful for a party having lost money by embezzlement to agree not to prosecute the embezzler upon his refunding the amount embezzled, or otherwise giving full indemnity or satisfaction. Embezzlement, whether of public or private funds, may be lawfully condoned upon repayment of funds embezzled. However, the Court holds that the facts in this case fail to show any agreement not to prosecute. (*Post, pp. 268, 269.*)

Code construed: § 5474 (M. & V.); § 4707 (T. & S.).

Cases cited and approved: Davis v. State, oral opinion at Jackson in 1890; Cheek v. State, oral opinion at Jackson in 1889.

---

### FROM DAVIDSON.

---

Appeal from Chancery Court of Davidson County. ANDREW ALLISON, Ch.

17—8 P

CHAMPION, HEAD & BROWN, H. H. BARR, and M. B. HOWELL for Capital City Bank.

DICKINSON & FRAZER for Fourth National Bank.

J. C. McREYNOLDS, STEGER, WASHINGTON & JACKSON, and A. S. COLYAR for Dunham & Co.

WILKES, J. In May, 1890, F. M. Allen, who was then teller of the Capital City Bank, of Nashville, through his friend Dismukes, made deals with the defendants, whereby he contracted for certain stocks of the market value of $90,000. The firm had head-quarters in Chicago, with a branch office at Nashville. H. D. Spears, a member of the firm, resided in New York, and was, as he states, a member of the New York Exchange. The defendants claim that they were engaged, both in Nashville and New York, in a legitimate brokerage business, Spears being in charge at New York and Frederick W. Hunter in charge at Nashville.

The manner of dealing was as follows: The customer desiring to deal at Nashville was required to deposit with the Nashville house $300 upon every purchase of one hundred shares of stock, the par value of the same being $10,000. When this was done the Nashville manager wired the New York manager to purchase the stock agreed on at a stipulated price. Spears, the New York member of the firm, says, upon receiving

the telegram, he. made the purchase on the New York Exchange, and wired that fact to the Nashville house, and it was communicated by that house to the purchaser. The entire purchase-price of the stock, it is claimed, was paid in New York by the member there to the person from whom the stock was purchased, and received the certificates of stock so purchased and held them in New York, but did not send them to Nashville or deliver them to the customer. Nothing appeared upon the books of the firm at New York to indicate who the purchaser was; nor did the manager there know for whom the transaction was made; but the purchase was charged up against the Nashville house. In the Nashville house the customer was charged with the full amount of the purchase-price paid in New York, and credited with the $300 deposited, less $25 commission. Each transaction with each customer was kept separate, and each deal of the customer was in the end closed out on its own basis, no matter how many purchases might be made for the same person. If there should be a decline in prices sufficient to exhaust the deposit, the customer was called upon to make an additional deposit, or, in other words, to keep up his margin; and, in default, the deal was closed out. Interest was charged by the New York house on the purchase-price, less the deposit, at six or eight per cent., dependent on the condition of the money market and other circumstances, and the stock was held

by the New York house to secure the amount advanced.

It is for the defendants earnestly insisted that each transaction was an actual one on the New York Exchange; that upon each purchase there was an actual receipt of a stock certificate, and on each sale an actual delivery of such certificate, by the New York house; and that the transactions were not in any way different from those daily made upon the New York Exchange, which have been uniformly held to be legitimate.

Spears testifies that he made the actual purchases and sales, and that the certificates were delivered to him; and he exhibits the telegrams on which the orders were executed, and gives the names of the several parties with whom the several transactions were made.

On the other hand, Dismukes, the party who did the purchasing, states that while it was represented to him that the stock was actually bought in New York, and held by the New York house, still he never expected or intended to take up or receive the stock, nor did Allen, his principal, so intend; that neither he nor Allen were financially able to make an actual purchase of so much stock, but he understood that margins were to be put up on the stock without any intention of ever paying for or receiving it, but that a final settlement was to be made when each separate deal was closed.

Allen states that he advanced margins for the

purpose of opening transactions with Dunham & Co., whereby, if the stocks advanced upon the market, he was to receive from them the difference between the cost and sale price when the deal was closed, less a commission and interest. If stocks declined, he was either to remargin or lose the margin already put up.

No idea was ever entertained by him of taking or paying for the stocks. He was not able financially to pay for them, which fact was known to the defendants.

After the purchases were made in May, stocks declined, and Dismukes, for Allen, remargined his stocks more than once, until about August, 1890, when the failure of the Baring Bros. precipitated a financial crisis, and prices tumbled rapidly.

About the eighteenth of August, Dismukes and Allen went together to see defendants, and for the first time it was made known to defendants that the purchases made by Dismukes were really for account of Allen. Upon their suggestion, the account was transferred to Allen, and Dismukes was released from all further connection with the transactions. No papers were drawn, no transfer executed, no notice was given the New York house; but the entire transaction, involving $90,000 in value, was changed by a mere entry upon the Nashville book from one debtor to another without any care or concern as to who was to be the debtor, and in the face of a rapid decline and panicked condition of the market. Mr. Hunter

states that upon this occasion Allen told him that he (Allen) had been dealing in a bucket-shop, but that he had decided to close out such deals and buy his stocks outright on the New York market, through defendants, so *as to bull the New York market;* but he seems not to have carried out this bold design, for he bought no additional stock, but simply succeeded to the purchases Dismukes had already made, and the next day threw over his entire holdings, in order to stay, as far as possible, any further calamity to himself.

It matters but little upon which side of this picture we look, whether from the stand-point of Dunham & Co. or of Allen. If we concede that the stock was actually purchased in New York, and certificates received there, as claimed, the question, very naturally, is suggested whether any sane man, looking at the situation of the parties, and the circumstances surrounding them, could believe, for one moment, that Allen ever intended to receive the $90,000 of stock, or that the defendants ever contemplated its delivery. There was no probable contingency by which Allen could ever become the owner of so much stock, and this fact was well known to defendants.

If we concede that the New York house did buy the stock and pay for it, and receive the certificates, yet it is manifest these purchases were made, not on Allen's account, but on account of the Nashville house. They were charged to the Nashville house, and not to Allen; they were not

kept separate and distinct from other purchases made by the New York house; no title to the stock vested in Allen; no delivery was made for his account; no stock was separated or held distinct by the New York house on Allen's account, and the purchases made could as readily have been held for account of any other customer as for Allen, and disposed of for any other instead of Allen.

This is very different from a case where stock is bought, directly or indirectly, in New York upon a specific order, and held in species to meet the demands of the buyer. In this latter event, the title to the stock vests in the purchaser, and it is held for him specifically, subject, it may be, to a pledge for the balance of purchase-money, and which may at any time be taken up by paying such balance and receiving the identical stock originally bought. Such a transaction is legitimate, though made largely upon a credit greater than the means of the customer would justify.

The case on trial is, at best, only a case where the Nashville house, having incurred a risk, has protected itself by a purchase in New York of a similar stock to meet this risk; but the stock is held by the New York house to protect the Nashville house, or for other reasons, and not on account of the customer.

In the case of *Irwin* v. *Willar*, 40 U. S. Rep., 499, 508, it was said: "Such a contract is only valid when the parties really intend and agree

that the goods are to be delivered by the seller, and the price to be paid by the buyer; but if, under the guise of such a contract, the real intent is merely to speculate in the rise and fall of prices, and the goods are not to be delivered, but one party is to pay the other the difference between the contract price and the market price of the goods, it is nothing more than a wager, and is null and void.

"When, from the nature of the transaction and the manner and method of carrying on the business, it is apparent that it is the intention of the parties, though not expressed, that they should settle upon the basis of the market price, the losing party paying the difference, the contract would be a gaming contract, and void. 33 Am. Rep., 393; 39 Mich., 337; Cook on Stock Brokers, Sec. 457, foot-pages 444, 445."

As between the broker and his customer, the broker is held to be dealing as a principal, and not as an agent, in all stock gambling transactions. Cook's Law of Stock Brokers, Sec. 346.

It has been the constant aim of our Courts, and of the Legislature, to prohibit and prevent gambling, and from time to time laws have been enacted to meet the various forms which this great public evil has assumed.

By an Act of the General Assembly of 1883, Chapter 251, page 331, it was provided "that hereafter any sale, contract, or agreement for the sale of bonds, stock, grain, cotton, or other produce,

property, commodity, article, or thing for future delivery, when either of the contracting parties, buyer or seller, is dealing simply for the margin, or on the prospective rise or fall in the price of the article, or thing sold, and when either of said contracting parties have no intention or purpose of making actual delivery, or receiving the property or thing in species, shall be deemed, and is hereby declared, gambling."

Under this law, the *intention* of either *buyer or seller* may stamp the transaction as *gambling.* Its object was to suppress the evil, and to make each of the contracting parties responsible for the intent of the other. Prior to the passage of this Act, and without regard to it, it had been held to be gambling when *neither* party intended an actual delivery; but it was often found difficult to prove the intent of one party, and this Act was passed to enable the Courts to look beneath the mask and determine the real character of the transaction from either stand-point.

In the case of *McGrew* v. *City Produce Exchange,* 1 Pickle, 578, this Court said, in construing the Act of 1883: "This Act was intended to make it unlawful if either party had no intention of effectuating a real purchase or sale. It was designed to suppress the evil of dealing in futures, and to limit such operations to *bona fide* sales and purchases by those who wished to sell to those who wished to buy. In making the seller responsible for the intent of the buyer, and the

buyer responsible for the intent of the seller, it intended to suppress gambling by confining the business of buying and selling for future delivery in such limits as would practically preclude the possibility of it. The *bona fide* dealer can still operate, but he cannot do so upon any terms which do not protect the community against the pernicious and ruinous speculation in the rise and fall of prices. He is obliged for his own safety, as this Act provides extreme penalties, to avoid the speculator, and buy only for the legitimate demands of necessity and trade."

We add to what has already been so well said, that there is no evil more demoralizing and pernicious in its tendencies and consequences than the spirit of reckless speculation which pervades so largely all sections of our country, and all classes of society. It inevitably leads to peculation, embezzlement, and other crimes. It crushes legitimate business, and creates an unhealthy excitement, which brings ruin as its result.

Numbers of cases of gambling contracts are no doubt being daily executed, to the great detriment of the public welfare, and but few of them find their way into the Courts, and while this Court does not presume to prescribe bounds in commercial ethics, nor to establish a protectorate over the public, nor, indeed, to enter the field of commercial politics and declare the credit system illegal, still it will, whenever a proper case arises, carry out the manifest intention of our laws to prohibit

Allen *v.* Dunham.

gambling, no matter what cloak or disguise may be thrown around it.

It is not the province of the Court to prevent trade, or even speculation, but it is its duty to draw the line between real transactions, which are legitimate, and sham transactions, which are gambling, and to protect society from the latter.

Now, what facts are developed in this case? We have a young man occupying an honorable and responsible position as bank teller, intrusted with the funds of the bank and its customers. Possessed with an unnatural desire to grow rich suddenly, he finds these defendants offering to him a field which he can enter for a comparatively small sum, and thereby become the ostensible owner and controller of stocks to an almost unlimited amount, subject to daily fluctuations, which, if favorable to him, would in one day realize for him more than he could earn in a year of hard labor at his legitimate work. Is it any marvel that he is induced to enter the inviting field? Now, would any respectable broker or bank have extended to this young man such extensive credit upon such small security upon any real transaction, or with any expectation or intention that the contract would be closed by a delivery of the stocks? We think not, and we are of opinion that, notwithstanding the stocks may have been bought in this case by the New York house, no title to such stock ever vested in Allen, or was ever intended so to vest, and we are further of opinion

that it was neither the intention of Dunham & Co. to make delivery to Allen, nor of Allen to receive the stocks; but the transaction was simply a dealing on margin, and on the prospective rise and fall of stocks, and was gambling under the statute and without the aid of the statute.

We do not mean to be understood as holding that a man cannot buy upon a credit far beyond his ability to pay if he chooses to do so, but we do mean to hold that, to make such transaction legitimate, it must be real between the parties, and the buyer must by his purchase acquire some sort of title to the thing he buys, and some sort of beneficial interest in the specific thing that he does buy, and his ownership in that specific thing must appear and be recognized.

Allen had a right, under the statute, to recover the money paid by him upon these gambling transactions to the defendants. After the lapse of ninety days, that right inured to the benefit of his wife. Both of them have assigned their rights to the Capital City Bank, to re-imburse it for moneys embezzled to make these and similar transactions.

It is insisted that, as a consequence of this transfer, this suit is tainted with champerty and maintenance. We do not so consider it, but hold that, under the terms of the contract of transfer set out in the record, the bank has a right to recover upon this transfer as it would on any other collateral assigned to it.

It is insisted also that the bank, in considera-

-tion of this transfer, has agreed that it will not prosecute Allen for embezzlement, and has thus -compounded a felony. We do not think this contention, as to the agreement with Allen, based on the record.

The consideration for the transfer is valid and legal. Even if there were an agreement not to prosecute Allen criminally (which we do not find from the record), this agreement, based upon the settlement of his embezzlement, would be a legal agreement and valid contract. Code (M. & V.), § 5474. This section embraces not only embezzlement of public funds, but funds of private individuals also. *Davis* v. *State* and *Cheek* v. *State*, Jackson, 1892.

We therefore hold that Allen and wife, for the use of the Capital City Bank, have a right to recover of defendants all such sums of money as were paid by him upon the several transactions had with them, with interest; and the decree of the Chancellor is reversed, and the cause remanded to the court below for proper account and decree for the repayment of same out of funds borrowed by defendants under the order in this cause.