## WILLIAMSON v. MAJORS.

(Circuit Court of Appeals, Fifth Circuit. May 10, 1909.)

No. 1,772.

1. GAMING (§ 49*)—DEALING IN FUTURES—GAMBLING TRANSACTIONS.

Evidence *held* to require a finding that plaintiff's transactions in cotton with defendant were gambling transactions and must have been so understood by both parties.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 102; Dec. Dig. § 49.*]

2. GAMING (§ 34*)—GAMBLING IN FUTURES—RECOVERY OF PAYMENTS.

Shannon's Code Tenn. § 3159, declares void all contracts founded in whole or in part on a gambling or wagering consideration, and section 3166 provides that any sale, contract, or agreement for sale of cotton for future delivery, where either of the contracting parties is simply dealing

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

for the margin or on the prospective rise or fall in price of the article or thing sold, or where either has no intention of making actual delivery or receiving the property in specie, shall be deemed gaming. *Held*, that under such section money lost on future contracts may be recovered by the loser, whether the wagering contract refers to prices in a foreign market or the parties acting as agents advance money in aid of wagering contracts on future prices of commodities, knowing them to be such.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 72; Dec. Dig. § 34.*]

3. GAMING (§ 2*)—GAMBLING CONTRACTS—VALIDITY—WHAT LAW GOVERNS.

Where a cross-bill was filed to foreclose a deed of trust on real property in Mississippi in a suit pending in that state, and such deed was given to secure a debt contracted by means of wagering transactions in cotton, whether the deed of trust was enforceable must be determined according to the laws of Mississippi.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 2; Dec. Dig. § 2.*]

4. GAMING (§ 2*)—GAMBLING CONTRACTS—VALIDITY—WHAT LAW GOVERNS.

Ann. Code Miss. 1892, § 1120, makes it a criminal offense for any person to deal in futures, and section 2117 declares that a contract for the purchase or sale of a commodity of any kind to be delivered at a future date, the parties not intending that the commodity shall be actually delivered in kind, shall not be enforced, nor shall any such contract be a valid consideration for any promise or undertaking. *Held*, that under such section a deed of trust on land in Mississippi, which was void in Tennessee, where it was executed, because given to secure losses on gambling transactions in cotton, was also void in Mississippi.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 2; Dec. Dig. § 2.*]

5. GAMING (§ 41*)—SECURITIES FOR LOSSES—CANCELLATION.

Under Ann. Code Miss. 1892, § 2116, providing that money lost on wagers may be recovered by suit, equity will grant relief to a complainant by the cancellation of a deed of trust, the consideration for which was losses in gambling transactions in cotton.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 84; Dec. Dig. § 41.*]

Appeal from the Circuit Court of the United States for the Southern District of Mississippi.

McLaurin, Armstead & Brien and Tim E. Cooper, for appellant.

Saunders, Dufour & Dufour, Smith, Hirsch & Landau, Charles Scott, and Woods & Scott, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge. The original bill in this cause was exhibited by the appellant, H. C. Williamson, in the chancery court of Bolivar county, Miss., in January, 1905, and the cause was removed by the defendant to the Circuit Court of the United States, in which court the defendant answered the bill and also filed a cross-bill for a foreclosure of the deed of trust. On final hearing, the court dismissed the original bill, and granted the relief prayed for by the cross-bill.

The complainant in his original bill averred that the defendant, Bettis Majors, was in the city of Memphis engaged in keeping a house for dealing in futures, as the professional representative of Hayward, Vick & Co., and afterwards of T. J. Majors & Co.; that the complainant

began to speculate in the purchase of futures in cotton with the said Hayward, Vick & Co., and afterwards with the firm of T. J. Majors & Co.; that it was not the intention of any of the parties that any of the commodities purchased should be actually delivered in kind and the price paid; that it was the intention of the parties to speculate only on the rise and fall of the market. The bill states that after the complainant had lost $5,700 in cash, which he had put up as margins, complainant notified Bettis Majors that he would not furnish any more money or deal further in such future contracts; that the defendant Majors insisted that complainant should continue to speculate by the purchase and sale of futures, and exhibited to complainant telegrams from his father instructing him to advise his customers to buy cotton, as the price of same would advance to 20 cents per pound; that Bettis Majors agreed, if the plaintiff would execute a mortgage on his Bolivar county plantation, that he would carry his future contracts until the United States Bureau Report should come out; that thereupon, upon the 6th day of February, 1904, complainant executed a deed of trust whereby he conveyed to A. T. Ball, trustee, the plantation in Bolivar county, Miss., to secure a promissory note for $30,295, dated that day, due on January 1, 1905, payable to the said Bettis Majors at his office in Memphis, Tenn. The consideration for the note was the margins on such future contracts as the complainant then had or might thereafter purchase; that as soon as Majors got this security, in violation of his promises to carry such future contracts until the Bureau Report came out, without consulting the complainant, he closed out his future contracts, involving complainant in a great loss; that, after such violation of his agreement by the said Bettis Majors, complainant learned that T. J. Majors and Bettis Majors, by reason of the telegrams and representations as to what the future price of cotton would be, were inducing the public to buy through them as brokers, and were, as a matter of fact, secretly unloading their own purchases upon the public and were "bucketing" the sales of their customers. Complainant also averred that after Majors got the note and deed of trust, knowing that the complainant was engaged in the business which required him to meet and deal with a number of business men in transactions of importance, he annoyed, harassed, and vexed complainant in reference to said margins claimed to have been lost by him, and has endeavored to embarrass complainant in the transaction of his business, and to injure his credit and financial standing; that he had sent letters to complainant with repeated demands that he should pay said losses so fraudulently claimed against complainant; that he endeavored to sell the note, and was claiming that the same was a correct and valid transaction; that, in conversation in the presence of others, Majors admitted that said obligations were not legal obligations and were not enforceable. The bill further avers that, under the laws both of Tennessee and Mississippi, said note and deed of trust were illegal, void, and not enforceable, and the prayer of the bill was that the same might be delivered up and canceled.

The defendant Bettis Majors by his answer denies that the firm of Hayward, Vick & Co. were keepers of a bucket shop, but conducting a

legitimate business in the city of Memphis in the purchase and sale of cotton, grain, provisions, etc. He denies that the contracts referred to in the bill were made without the intent of the parties to the contract that the commodity bought and sold should be delivered in kind and the price paid. The defendant denies all invitations and inducements on his part to the complainant to engage in the purchase or sale of cotton futures, and denies that any representations were made as to what the future price of cotton would be. He denies that he made any promises to carry for complainant said contracts until the Bureau Report should come out. He denies that he ever violated any agreement with the complainant. He denies all fraudulent dealings charged in the bill. He denies that he ever presented any fraudulent claim to the complainant. He denies that under the laws of the states of Tennessee and of Mississippi the said note and deed of trust are void or unenforceable. He denies that the same were given in any gambling transaction. The answer then proceeds to state that Hayward, Vick & Co., and T. J. Majors & Co., successors to the first firm, were members of the New Orleans and New York Exchanges. That all contracts for the purchase of cotton were made upon one or the other of said exchanges, same having been bought in New York by J. H. Parker and Co., or in New Orleans by Hayward, Vick & Co., who were correspondents of T. J. Majors & Co. Defendant avers that no orders were given to buy or sell cotton in Memphis, but that all orders were given to be executed in New York or New Orleans. That all said contracts contemplated the actual delivery of the property bought or sold. That on February 6th there was a difference in price of cotton which the complainant bought, by reason of which the complainant was indebted $30,295, and being unwilling to sell his cotton sought to borrow the money from capitalists in Memphis, and, being unable to do so, requested the defendant to pay to Hayward, Vick & Co. and J. H. Parker & Co. the said sum of $30,295, and, to secure complainant, executed the deed of trust and note described in the bill. That in consideration thereof the defendant agreed to advance complainant the further sum of $10,000. That complainant, being unwilling to put up further margins, Hayward, Vick & Co., under the rules of the respective exchanges, sold the cotton, entailing a loss of $40,-991.75. That for said amount T. J. Majors & Co. were liable to Hayward, Vick & Co. and J. H. Parker & Co., and that the defendant, at the request of the complainant, advanced his own money to settle such claim; thereupon complainant executed his note for $40,991.75, and delivered the same to the defendant. That said note was actually executed after the defendant had paid to Hayward, Vick & Co. and J. H. Parker & Co. the amount thereof, and that complainant voluntarily dated the note back as of the 6th day of February, 1904, and voluntarily inserted in said note the stipulation that it was secured by the said deed of trust which had been executed on the 6th day of February, 1904. The answer sets up the statutes of Tennessee, and claims that the same are void, as violative of certain provisions of the federal Constitution.

The defendants also filed a cross-bill by which, in effect, they aver that complainant owed Majors $30,295 on the 6th day of February,

1904, and on that day executed a note for said sum, and deed of trust on the property in Mississippi securing the same. That afterwards the complainant became further indebted to the defendant Majors in the sum of $10,696.75, making in the aggregate $40,991.75. That Williamson executed a note for said sum, but refused to return the note for $30,295, or to execute a second deed of trust to secure the note for $40,991.75, but inserted in the note a stipulation that it was secured by said deed of trust.

By the cross-bill the cross-complainant avers the validity of said deed of trust, and that it secured not only the $30,295 note, but also the $40,991.75, and cross-complainants pray the foreclosure of the said deed of trust for the payment of said note.

As to salient facts, the record shows:

In December, 1903, and in the early months of 1904, Bettis Majors, the appellee, managed and conducted in the city of Memphis a broker's establishment for the buying and selling of cotton futures in the New Orleans and New York Cotton Exchanges. In December, 1903, the establishment was operated for Hayward, Vick & Co., but afterwards in January it was operated for T. J. Majors & Co. as the successors of Hayward, Vick & Co. T. J. Majors, as the father of Bettis Majors, was interested in the firm of Hayward, Vick & Co., and was the senior member of the firm of T. J. Majors & Co., composed of T. J. Majors and the appellee, Bettis Majors.

The appellant, H. C. Williamson, was a real estate agent in the city of Memphis, and was not engaged in buying or selling cotton, but in December of 1903 commenced to speculate in cotton futures, dealing with the establishment operated by the appellee, and thus ostensibly through the firms of Hayward, Vick & Co. and T. J. Majors & Co. At first his speculations were successful, but after, his losses were large. He testifies that, after he had paid $5,700 in, he desired to retire with the loss he had sustained, but that the appellee advised and insisted that he should continue in the speculations and put up cash for margins to protect the future contracts he had made. He further shows that negotiations resulted in Williamson's agreeing to give a note to protect his future contracts, and a deed of trust on his plantation in Mississippi to secure the same, and accordingly on the 6th of February, 1904, he executed a deed of trust on his plantation situated in Bolivar county, Miss., to secure a promissory note of $30,295, due and payable January 1, 1905, to Bettis Majors, at his office in Memphis, Tenn., the consideration alleged being money loaned, but the real consideration was indebtedness on the future contracts for the purchase of cotton then claimed to be standing in Williamson's name.

The deed of trust contains the following stipulation:

"The real subject-matter of this contract, namely, security, being wholly located in the state of Mississippi, this deed of trust and the notes thereby secured shall, without regard to the place of contract or payment, be construed and enforced in accordance with the laws of the state of Mississippi, where the money loaned is to be used, and with reference to the laws of which state the parties to this instrument are now contracting, and this instrument and all notes secured hereby are to be construed as if it and the notes which it secures had been signed in the state of Mississippi, and said notes had been made payable there, it being the intention of all the parties that such construction should be had."

Bettis Majors testifies as follows:

"In the early part of December, 1903, Mr. Williamson gave me some orders to buy or purchase some cotton on the New Orleans and New York Cotton Exchanges. Of course, the order was given to me as manager for Hayward, Vick & Co., or to one of my employés, and we did buy the cotton for him on the exchanges, and he made considerable money on his purchases, and then after the firm changed to T. J. Majors & Co. he continued to purchase cotton, and he owed the firm of T. J. Majors Company about twelve thousand dollars, I think it was on a Friday—I don't remember the date, but I called him for it, and he said to me, 'I cannot put up that money this afternoon, but I will have it by Monday, about seven thousand dollars, and I will bring that around.' I said to him, 'Mr. Williamson, I cannot carry your cotton as a firm; I cannot use the firm's money for that purpose, but I will, individually, carry your cotton for you until Monday; then you bring the money in.' He said he had other collateral which he thought he could take to the bank or some one, I don't know who, and get more money on it on Monday. He did deposit some money with me—I think it was Monday—I don't remember the exact amount; I think it will be shown by those receipts you have on exhibit there. I carried the cotton. The market continued to decline, and I carried his loss till he owed me thirty thousand two hundred and ninety-five dollars. He offered to give me a trust deed for this money on his plantation down in Mississippi. * * *

"Well, Mr. Williamson got from Mr. Caldwell one of his trust deeds or mortgages, and he came down to my office and copied from the one that Mr. Caldwell had originally made, the one which we have here on exhibit. He gave the note for thirty thousand two hundred and ninety-five dollars; drew that himself; and a few days afterwards, I sent it out to his house to get it acknowledged. I wanted it acknowledged before a notary. I sent it out to him, and he acknowledged it at his home. During that conversation with Mr. Caldwell, Mr. Williamson asked me if I would carry his cotton for him, ten thousand dollars more, or I would let him have ten thousand dollars more. I agreed to let him have ten thousand dollars if he needed it. He said that he wanted to carry the cotton until the census report came out. I said, 'Mr. Williamson, I will give you ten thousand dollars more to carry that cotton on, whether it will carry you to the census report or not. I cannot tell, because I don't know what the market is going to do.' Well, I did let him have the ten thousand dollars additional. I think the day before the census report came out the market had declined enough to wipe out this ten thousand dollars and more. Mr. Williamson came into my office and I told him that I could not carry this cotton any further for him, so he said, 'Well, in order to protect yourself, close it out.' I said to Mr. Bomer: 'You close this cotton out.' Mr. Bomer did close the cotton out for Mr. Williamson.

"Q. Was Mr. Williamson present at the time the cotton was closed out? A. He was.

"Q. Was it done according to his transactions? A. It was.

"Q. Now, Mr. Majors, is this the trust deed? A. Yes.

"Q. Given you at the time by H. C. Williamson to which you refer in your testimony? A. Yes, sir.

"Q. In whose handwriting is that trust deed? A. In Mr. Williamson's.

"Q. I will ask you to file that deed of trust as Exhibit "A" to your depositions? A. Yes, sir.

"Q. I see the note, Mr. Majors, is for forty thousand nine hundred and ninety-one dollars and seventy-five cents, instead of for thirty thousand two hundred and ninety-five dollars; will you please state whether or not the note was ever executed for the thirty thousand two hundred and ninety-five dollars, and, if so, what became of that note? A. Yes, there was a note given for thirty thousand two hundred and ninety-five dollars; that note was destroyed by Mr. Williamson when he gave the one for forty thousand nine hundred and ninety-one dollars, covering the full amount of his indebtedness to me.

"Q. That was done, the second note of forty thousand nine hundred and ninety-one dollars and seventy-five cents was made, after you had closed out his trades on the exchange, as per his instructions? A. Yes, sir.

"Q. I think this note which I handed you is dated February 6th, and is for forty thousand nine hundred and ninety-one dollars and seventy-five cents. Will you please state how that happened to be dated as of that date? A. Well, it was dated back on the same date that the thirty thousand two hundred and ninety-five dollar note was given."

The following partial list of purchases and sales of cotton for alleged future delivery, taken seriatim from one of the undisputed exhibits, shows the character and somewhat of the scope of Williamson's dealings with the establishment operated by Bettis Majors for Hayward, Vick & Co. and T. J. Majors & Co.:

| Bought. | | | Sold. | | |
|---|---|---|---|---|---|
| Dec. | 3 | 100 March | Jan. | 1 | 100 March |
| Dec. | 9 | 100 March | Jan. | 4 | 100 March |
| Dec. | 23 | 100 August | Jan. | 11 | 100 August |
| Dec. | 23 | 100 August | Jan. | 11 | 100 August |
| Dec. | 24 | 100 August | | | 100 August |
| Dec. | 29 | 100 August | Jan. | 11 | 100 March |
| Jan. | 2 | 100 July | Jan. | 11 | 100 July |
| Jan. | 5 | 100 July | Jan. | 11 | 100 July |
| Jan. | 5 | 100 May | Jan. | 11 | 100 May |
| Jan. | 6 | 100 March | | | 100 March |
| Jan. | 14 | 100 March | Jan. | 15 | 200 March |
| | | 100 March | | | 100 May |
| | | 100 May | Jan. | 18 | 200 March |
| Jan. | 15 | 200 March | Jan. | 22 | 200 May |
| Jan. | 16 | 200 May | Jan. | 11 | 200 May |
| Jan. | 21 | 200 May | Jan. | 22 | 100 July |
| | | 100 July | Jan. | 23 | 300 March |
| | | 200 March | Jan. | 25 | 100 May |
| | | 100 March | Jan. | 25 | 100 May |
| Jan. | 22 | 100 May | Jan. | 26 | 200 August |
| Jan. | 22 | 200 August | Jan. | 27 | 200 March |
| Jan. | 23 | 100 May | Jan. | 25 | 200 August |
| Jan. | 24 | 200 August | Jan. | 27 | 100 August |
| Jan. | 26 | 200 May | Jan. | 27 | 500 March |
| Jan. | 25 | 300 August | Jan. | 30 | 400 March |
| Jan. | 26 | 500 March | Jan. | 30 | 100 July |
| Jan. | 25 | 200 March | Jan. | 26 | 300 August |
| Jan. | 26 | 200 May | Jan. | 27 | 500 March |
| Jan. | 28 | 200 March | Jan. | 30 | 100 May |
| Jan. | 29 | 200 March | Feb. | 1 | 100 May |
| Jan. | 28 | 100 July | | | 100 May |
| Jan. | 28 | 100 May | | | 100 May |
| Feb. | 1 | 100 May | | | 100 May |
| Jan. | 30 | 100 May | Feb. | 3 | 300 March |
| | | 200 May | | | 500 May |
| Feb. | 3 | 100 March | | | 200 May |
| | | | | | 100 May |
| | | 200 March | Feb. | 12 | 400 May |
| | | 800 May | Feb. | 12 | 400 May |
| Jan. | 30 | 200 May | Feb. | 12 | 100 May |
| | | 200 May | Feb. | 12 | 100 May |
| Feb. | 1 | 200 May | Feb. | 12 | 200 May |
| | | 200 May | Feb. | 12 | 100 May |
| | | 300 May | Feb. | 12 | 100 May |
| Feb. | 2 | 100 March | Feb. | 12 | 100 May |
| | | 200 March | Feb. | 12 | 200 March |
| Feb. | 3 | 300 May | Feb. | 12 | 100 March |
| | | 200 May | Feb. | 8 | 100 May |
| | | 100 May | Feb. | 9 | 100 August |
| | | 300 August | Feb. | 9 | 200 August |

Statements were made from time to time and, as they illustrate the business carried on, samples are given, to wit:

Statement.

Purchase and sale of 100 B/C in July, N. O. for account and risk of H. C. Williamson,

|                           |                     |         |
| ------------------------- | ------------------- | ------- |
| City.                     |                     |         |
| C. B. Johnson & Co., Memphis. |                 |         |
| (Stationers)              |                     |         |
| 1/5 Bought 100 July N. O. |                     | $ 14 03 |
| 1/11 Sold July N. O.      |                     | 14 64   |
| Difference 61 points @ $5.00 |                  | 305 00  |
| E. & O. E.                | Telegrams           |         |
| Hayward, Vick & Co.       | Brokerage           | 10 00   |

Net profit.................................................. 295 00

Per B.

Memphis, Tenn., 1/11, 1904.

Memorandum.

Memphis, Tenn., 1/25, 1904.

H. C. Williamson, City.

We have made the following transactions for your account and risk:

Bot. 2 Mch. N. O. curb.............................................1531

T. J. Majors & Co.

Successors to Hayward, Vick & Co.

Yours truly,                          Hayward, Vick & Co.

Per............

All orders for the purchase or sale of any article are received and executed with the distinct understanding that actual delivery is contemplated, and that the party giving the orders so understands and agrees. It is further understood that on all marginal business the right is reserved to close transactions when margins are running out without further notice, and to settle contracts in accordance with rules and customs of exchange where order is executed.

The evidence shows that nearly all of Williamson's purchases and sales were made through and on the Cotton Exchanges of New Orleans and New York, and in accordance with the rules of said exchanges, under which actual delivery is said to be contemplated, and may, by a member of the exchange, be exacted (whether by an outsider is not clear); but, as a matter of fact, under the said rules, delivery is rare, the general practice being to take profits or pay losses as the prices vary. And under the said rules a ringing-out process is provided, which is a sort of clearing house for the day's transactions, wherein and whereby purchases and sales are transferred and eliminated, with the possible, if not probable, result that an outside dealer's contract is with his own broker, and thus the same person be the buyer and seller, as was practically the case when Bettis Majors, as he testifies, closed out Williamson's holdings.

There was much evidence bearing on the question as to whether the Memphis establishment managed by Bettis Majors was or not a bucket shop; and on the allegation that each and every order of Williamson to buy or sell cotton futures was executed on the exchange and strictly according to rule, and as to the impeccability of the rules of the New Orleans Cotton Exchange in the matter of actual delivery of all products sold therein and thereon—as to all of which, and under our view of the other issues, no finding need be given here.

From what has been recited, it is clear that, in his buying and selling cotton futures, Williamson, who was in the real estate business and not in the cotton business, had no intention to actually buy or sell cotton, but was merely speculating on the rise and fall of the cotton market, intending to settle by receiving or paying differences, in fact, gambling in cotton futures, and it seems clear that Bettis Majors knew all about it. Certainly, from a mere inspection of Williamson's orders, he ought to have known it. Under the evidence, to assume his ignorance of Williamson's gambling would be a reflection on his intelligence. Knowing the nature of Williamson's dealings in cotton futures, he facilitated, if not encouraged him, furnished credit and money to carry on the same, and, finally, took the transactions off his hands by "closing out" as to Williamson and "taking them over" to himself.

In Embrey v. Jemison, 131 U. S. 343, 9 Sup. Ct. 778, 33 L. Ed. 172, Mr. Justice Harlan, for the court, says:

"Whether the validity of the original contract for the purchase of future-delivery cotton must depend upon the New York statute or upon the Virginia statute, it is not important to determine; for, if such contract, as alleged, is a wagering contract, it is void under the law of either state. The plea makes a case of money advanced by the plaintiff's firm solely for the purpose of carrying 'cotton futures,' for which he or they contracted, when, according to the averments of the rejected plea, neither party contemplated the purchase or delivery in fact of cotton, and when it was understood that any settlement in respect to such purchases should be exclusively upon the basis of one party paying to the other only the difference between the contract price and the market price of said cotton futures, according to the fluctuations in the market. If this be not a wagering contract, under the guise of a contract of sale, it would be difficult to imagine one that would be of that character. The mere form of the transaction is of little consequence. If it were, the statute against wagers could easily be evaded. The essential inquiry in every case is as to the necessary effect of the contract and the real intention of the parties. * * *

"In Irwin v. Williar, 110 U. S. 499, 508, 510, 4 Sup. Ct. 160, 28 L. Ed. 225, the general subject of wagering contracts was carefully considered, and, in the opinion delivered by Mr. Justice Matthews, we expressed approval of the doctrine as announced by Mr. Benjamin, observing that generally, in this country, all such contracts are held to be illegal and void as against public policy. It was there said: 'It makes no difference that a debt or wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade.' Referring to the decision in Rountree v. Smith, 108 U. S. 269, 2 Sup. Ct. 630, 27 L. Ed. 722, it was further said: 'It is certainly true that a broker might negotiate such a contract without being privy to the illegal intent of the principal parties to it which renders it void, and in such a case, being innocent of any violation of law, and not suing to enforce an unlawful contract, has a meritorious ground for the recovery of compensation for services and advances. But we are also of the opinion that when the broker is privy to the unlawful design of the parties, and brings them together for the very purpose of entering into an illegal agreement, he is particeps criminis, and cannot recover for services rendered or losses incurred by himself on behalf of either in forwarding the transaction.' In the present case, according to the averments in the plea of wager, the plaintiff was the broker who effected the purchases of future-delivery cotton. He was privy to the unlawful design of the parties; represented one of them in all the transactions; and advanced the money necessary to carry, and for the express purpose of carrying, these cotton 'futures' on account of the defendant. His position, therefore, was not that of a person merely advancing money to or for one of the parties to a wager,

without having himself any direct connection with the making or execution of the contract of wager itself. He was, in every sense, particeps criminis."

We find nothing in Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. Ed. 819, or in Board of Trade of the City of Chicago v. Christie Grain & Stock Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, cited by appellee, nor in any other Supreme Court decision brought to our attention, in conflict with or even modifying Embrey v. Jemison, supra, and that case must influence the decision of the main issues in this case; but in view of the pleadings, and considering that the transactions complained of were in Tennessee, that the present case is now pending in the Circuit Court of the United States in Mississippi, and relief is asked under the laws of the last-named state, it is proper, if not necessary, to further consider the questions involved under Tennessee and Mississippi laws.

"Section 3159, Shannon's Code of Tennessee, declares void all contracts founded in whole or in part on a gambling or wagering consideration; and section 3166 of the same Code provides that:

"Any sale, contract or agreement of sale of bonds, stock, cotton, grain or other produce, property or commodity, article or thing for future delivery, where either of the contracting parties, buyer or seller, is simply dealing for the margin or on the prospective rise or fall in price of the article or thing sold, or where either of the contracting parties have had no intention or purpose of making actual delivery or receiving the property or thing in specie, shall be deemed and it is hereby declared gaming."

These statutes have been construed by the Supreme Court of the state of Tennessee in McGrew v. City Produce Exchange, 85 Tenn. 573, 4 S. W. 38, 4 Am. St. Rep. 771, Dunn v. Bell et al., 85 Tenn. 582, 4 S. W. 41, and Allen v. Dunham, 92 Tenn. 258, 264, 21 S. W. 898.

In these cases, among other things, it was held that money lost on future contracts may be recovered by the loser; that it makes no difference if the wagering contract be made in reference to prices in a foreign market over which the parties have no control, or that parties acting as agents advance money in aid of wagering contracts on future prices of commodities knowing them to be such; that stockbrokers are responsible as principals, and the statute of 1883 which makes future contracts void if either party intends them as wagers is fully recognized.

The parties to the present transaction lived and contracted in Tennessee, and it would seem that under the Tennessee statutes the transactions were clearly gaming transactions, and therefore that the note given by Williamson to Majors, the consideration of which was for losses that Williamson had made speculating in cotton, should be held void.

This present suit is one in the state of Mississippi for the foreclosure of a deed of trust on a plantation in that state to secure the abovementioned note, wherein the parties have stipulated, as hereinbefore recited, that the same should be construed and enforced in accordance with the laws of the state of Mississippi. As to the force and effect of this agreement, see Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102, 27 L. Ed. 104; Liverpool & Great Western Steam Co. v. Phenix

Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; Osborne v. Railroad Co., 147 U. S. 248, 13 Sup. Ct. 299, 37 L. Ed. 155; Pinney v. Nelson, 183 U. S. 144, 22 Sup. Ct. 52, 46 L. Ed. 125.

Irrespective of this agreement, we are of opinion, as the real property to be affected lies in the state of Mississippi and the suit is one pending in the courts of that state, the deed of trust must ex necessitate be construed and effect given to it in accordance with the laws of the state of Mississippi. De Vaughn v. Hutchinson, 165 U. S. 566, 17 Sup. Ct. 461, 41 L. Ed. 827, citing United States v. Crosby, 7 Cranch, 115, 3 L. Ed. 287, Brine v. Insurance Co., 96 U. S. 627, 24 L. Ed. 858.

The Mississippi Annotated Code of 1892 provides as follows:

"1120. If any person shall deal in contracts commonly called 'Futures,' or shall, by himself or his agent, directly or indirectly buy or sell any 'future' contract, he shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than fifty dollars nor more than five hundred dollars, and be imprisoned in the county jail not more than three months.

"1121. If any person shall buy or sell commodities of any kind, to be delivered at a future day, without agreeing and intending that the commodities are to be actually delivered in kind, and the price paid, he shall be guilty of a misdemeanor, and, on conviction, shall be punished as prescribed in the last section."

"2117. A contract for the purchase or sale of a commodity of any kind to be delivered at a future day, the parties not intending that the commodity is to be actually delivered in kind and the price paid, shall not be enforced by any court; nor shall any contract of the kind commonly called 'futures' be enforced, nor shall a contract in this section mentioned be a valid consideration, in whole or in part, for any promise or undertaking."

These statutes indicate beyond question that dealing in future contracts, not intending that the commodity in question is to be actually delivered in kind or the price paid, is deemed gambling and contrary to the public policy of the state of Mississippi, and that has been the construction given to them by the Supreme Court of the state.

The original act on the subject passed on March 7, 1882, was entitled "An act to prohibit the sale and purchase of futures in the state of Mississippi." The first section of this said act provided that "it would be unlawful to deal in contracts commonly called 'Futures,'" etc.; and the second provided that:

"No money advanced for the purchase of futures nor any agreement for the payment of any sum for such purchases could be enforced in any court of the state.

Under this statute the case of Lemonius v. Mayer, 71 Misc. 514, 14 South. 33, was decided, in which it was held that the statute applied not only to contracts for futures made within the state but also to contracts for futures made without the state, sought to be enforced therein.

The language of the act of 1882 having been slightly changed by the codification of 1892, the future contract question was again before the Supreme Court in Violett et al. v. Mangold (Miss.; decided May 14, 1900) 27 South. 875, in which the Supreme Court of the state, in affirming judgment holding the note sued on to be void as based on losses in dealing in futures, said:

"Calhoon, J. Wilkins v. Riley, 47 Miss. 306, and Clay v. Allen, 63 Miss. 426, have no similarity to the case in hand. Looking through the gossamer

disguise here, it is glaringly apparent that the promissory note sued on is based on an account for losses in dealings in futures. We uphold the public policy of the state. Ann. Code 1892, §§ 1120, 1121, 2117; Lemonius v. Mayer, 71 Miss. 514, 14 South. 33."

It thus appears that the note and deed of trust given by Williamson to Bettis Majors are void on general principles (Embrey v. Jemison, supra), void in Tennessee where executed, and void in Mississippi, where the property involved is situated, as against the laws and public policy of that state; and it follows that the decree appealed from must be reversed.

As to the relief to be granted, we are clear that the appellee is entitled to none, and his cross-bill should be dismissed.

As to the relief asked by complainant below, to wit, the cancellation of the deed of trust given by him to secure the note based on losses in dealing in "futures," there is more difficulty. He is in pari delicto, and courts of equity are loth to relieve parties in such cases; the general rule being to apply the maxim, "He who comes into equity must come with clean hands," and "In pari delicto potior est conditio defendentis."

We find, however, that section 2116, Code Miss., provides that money lost on wagers can be recovered by suit, and that there is a line of authority, English and American, to the effect that courts of equity will grant relief in gaming contracts on the ground of public policy. We have not the English cases at hand, but in Rucker v. Wynne et al., 2 Head (Tenn.) 617, and Johnson v. Cooper, 2 Yerg. (Tenn.) 524, 24 Am. Dec. 502, both well considered, the English authorities are reviewed and shown to support the doctrine.

And we find the following in Story's Eq. Jur. § 302:

"In regard to gaming contracts it would follow, a fortiori, that courts of equity ought not to interfere in their favor, but ought to afford aid to suppress them, since they are not only prohibited by statute, but may justly be pronounced to be immoral, as the practice tends to idleness, dissipation, and the ruin of families. No one has doubted that under such circumstances a bill in equity might be maintained to have any gaming security delivered up and canceled."

See, also, 20 Cyc. p. 954, and cases there cited.

These authorities satisfy us that the complainant below should have the relief he prays for.

The decree of the Circuit Court is reversed, and the cause is remanded with instructions to enter a decree in accordance with the views herein expressed.