## JAMES v. CLEMENT et al.

(Circuit Court of Appeals, Fifth Circuit. May 25, 1915.)

No. 2544.

1. GAMING ⊙⟶49—WAGERING CONTRACTS—PURCHASES AND SALES OF COTTON FOR FUTURE DELIVERY—VALIDITY OF CONTRACTS.

Evidence considered, in an action by cotton brokers to recover advances by them in settlement of contracts made for defendant for the purchase and sale of cotton for future delivery on the New York Cotton Exchange, and *held* to show that it was understood by both parties that there was to be no actual delivery of cotton under such contracts, but that they were merely speculative or wagering contracts on the future price of cotton, intended to be settled by the receipt or payment of differences between the contract and market price; the evidence consisting of the undisputed testimony of defendant that he so stated to plaintiffs' agent, who procured the business, before any of the transactions took place, supported by the correspondence between the parties, which, fairly construed, was consistent only with such understanding, and the further fact that, although there was a series of such contracts, no actual delivery was called for or made under any of them.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. §§ 100–102; Dec. Dig. ⊙⟶49.]

2. GAMING ⊙⟶12—WAGERING CONTRACTS—VALIDITY OF CONTRACT—DEALING IN FUTURES.

Where there was a mutual understanding between cotton brokers and a customer that purchases and sales of cotton futures on margin made for the customer were purely speculative and wagering contracts, they are not validated by the fact that they were executed in accordance with the rules of the New York Cotton Exchange and in the form prescribed by such rules, which called for an actual delivery of the cotton; it being also true that under the rules the contracts could be settled without delivery.

[Ed. Note.—For other cases, see Gaming, Cent. Dig. § 22; Dec. Dig. ⊙⟶12.

Sales or purchases under agreements for settlement of differences between contract price and market price as wagering contracts, see note to Ware v. Pearson, 98 C. C. A. 368.]

In Error to the District Court of the United States for the Northern District of Georgia: Wm. T. Newman, Judge.

Action at law by Waldo P. Clement and another, as surviving partners of Haven & Clement, against D. W. James. Judgment for plaintiffs, and defendant brings error. Reversed.

See, also, 185 Fed. 692, 107 C. C. A. 640; 217 Fed. 51, 133 C. C. A. 170.

Alex W. Smith, of Atlanta, Ga., for plaintiff in error.

Hollins N. Randolph, Robert S. Parker, and Spencer R. Atkinson, all of Atlanta, Ga., and John R. Abney, of New York City, for defendants in error.

Before PARDEE and WALKER, Circuit Judges, and MAXEY, District Judge.

PARDEE, Circuit Judge. This case was formerly before this court (185 Fed. 692, 107 C. C. A. 640), and to clearly understand the pres-

ent aspect it is well to restate from our former opinion what was heretofore decided and to a certain extent became the law of the case, as follows: ,

"Pardee, Circuit Judge. In substance and effect this suit is one brought to recover specific sums of money paid out by the plaintiffs, Haven & Clement, as agents, and brokers for the defendant, James, in purchasing and selling cotton futures; and the defense is that all the transactions for which plaintiffs paid out money were by intention and understanding of the parties, and in fact, gambling transactions; that is to say, only wagers depending upon the fluctuations of futures and the variations of the prices thereof upon the New York Cotton Exchange, with the understanding and intent of both parties that all such wagers should be lost or won according to such fluctuations in the price of futures in the New York Cotton Exchange, and, incidental to such defense, that all transactions in the New York Cotton Exchange for the purchase and sale of cotton for future delivery were under the technical rules of the Exchange providing for 'ringing out' and substituting contracts by the brokers without the knowledge of principals, and in the delays and technical notices and other formalities thrown in the way of any actual delivery, were, in fact, wagering transactions.

"As to this incidental defense, we notice that, under the evidence admitted on the trial of the case (all of which is found in the transcript), the particular transactions wherein Haven & Clement claimed that they purchased and sold cotton futures for the account of James for which they paid out moneys and now ask judgment were under the rules of the Exchange and otherwise so 'rung out,' substituted, arranged, and settled that the interests of no other or third parties are involved; and the validity of the transactions must stand or fall according to the actual agreements and intentions of the parties to this suit without reference to the character and manner of the business carried on in the New York Cotton Exchange, further than it is useful in throwing light upon the actual understanding and agreements between Haven & Clement on the one side and James on the other. * * *

"The bill of exceptions shows that prior to the charge of the court counsel for the defendant requested the court to give the jury the following instruction, to wit: 'I charge you that speculating or wagering contracts are void, and a broker or commission merchant cannot recover for advancement made on account of customer on account of such contracts. If there was no intention of buying or selling cotton, but the contract was only speculative in the present case, there can be no recovery'—and that the court declined to give the said request to the jury. Also, that counsel for the defendant requested the court to charge the jury as follows: 'I charge you further, gentlemen, that no rights can arise in favor of either party to a contract of agency where the agency was created for an illegal purpose. If the plaintiffs and defendant contracted one with the other and the purpose of the contract was to play the market in cotton futures, the agency was illegal, and neither party would have the right to sue the other for losses or profits growing out of such agency' —which also was refused.

"In each the trial judge certifies that 'the same is not covered by any portion of the charge to the jury.' These specially requested charges seem to be sound in law, and their application to the case in hand is beyond question. They certainly were not in unambiguous terms given to the jury, and it seems with the mass of evidence in the case, mainly devoted to the collateral, but not controlling, issue, involving the character of the rules and proceedings of the New York Cotton Exchange, these or similar distinct instructions bearing on the main issue in the case should have been given to the jury. * * *

"The bill of exceptions further shows that prior to the charge of the court counsel for the defendant requested the court in writing to charge the jury as follows: 'I charge you further, gentlemen, that, even if it should be true that the defendant promised to pay this claim, yet if the claim arose by reason of a wagering, illegal, or immoral contract, the promise of payment would not be binding.' The defense was that the transactions insisted upon by the plaintiffs as entitling them to recover were wagering and illegal. The plaintiffs adduced evidence tending to show a promise on the part of defendant

to pay the amount claimed. The instruction seems to be good in law, and, as it was applicable to the case, we are of opinion that it was prejudicial error to refuse it because, under the case as presented by the transcript, we cannot say that the evidence given of the defendant's promise to pay was not a controlling factor with the jury in reaching the verdict rendered.  *  *  * The charge of the trial judge is before us because it is incorporated in the bill of exceptions duly allowed and signed.

"As heretofore pointed out in discussing the pleadings, and also in considering the nineteenth, twentieth, twenty-first, and twenty-third assignments of error, the controlling issue in the case was whether or not the amounts sued for by the plaintiffs below were for moneys advanced at the request and for the benefit of the defendant on wagering contracts. The transcript shows that there was evidence offered and admitted tending to show that they were illegal wagering contracts within the knowledge and intent of both parties, and also that there was a large mass of all kinds of evidence bearing upon the collateral issue in respect to the character of dealings upon the New York Cotton Exchange, and some bearing on other minor issues. Under these circumstances, and to the end that the jury might correctly apply the evidence, it was incumbent upon the trial judge to clearly and specifically instruct the jury on the law bearing on the main and controlling issue. The charge thereon was as follows: 'It is next claimed by the defendant that the evidence shows that Mr. James and the plaintiff's representative, Mr. Tate, had an express understanding that this arrangement made by Mr. James with the plaintiff firm was a mere wagering arrangement, and that both parties so understood it. If what he says about that—he told you about that on the stand —that there was to be no delivery of cotton, that is, it was simply taking—I do not remember the exact expression he used, a 'flier,' or something like that, but you will remember what he said, and that Mr. Tate so understood, that he told Mr. Tate that. And you heard what Mr. Tate said. He denied it. If there was an agreement made between Mr. Tate and Mr. James, and if Mr. Tate was to do the business as he described it, and if he had authority to make this sort of an agreement, of course, these contracts would fail and could not be enforced at all. If the arrangement Tate had with James was that it was to be a mere wagering contract, and no delivery contemplated at all, the contracts could not be sustained. That is for you to say. But my understanding of Mr. James was upon the line indicated by me heretofore that Mr. James wanted Mr. Tate to understand that: 'This thing I am to do with you has nothing to do with my business at Blakely. It is entirely separate and distinct.' Of course, he may have intended it differently, but that is the impression I got. If you understood it differently, and if you believe they had the understanding here claimed by the defendant and his counsel, it would render these contracts invalid.'

"It is contended that this is involved and argumentative, and does not sufficiently point out the importance of the issue presented although it is admitted that its real meaning is that, if the jury found that the arrangement between the parties was understood by both of them to be a mere 'wagering' contract, plaintiffs could not recover. Certain it is that the charge does not refer to section 3668 of the Code of 1895 of Georgia, which controls in suits in that state on wagering contracts, and declares such contracts to be against the policy of the law and not to be enforced, nor does it otherwise advise the jury as to what are wagering contracts and the public policy relating thereto. The charge deals with the issue as though there was no other evidence thereon than that found in the conversations between Tate, the plaintiff's agent, and the defendant, James, while the bill of exceptions shows the course of dealing between the parties which throws much light on the subject, and shows other pointed facts and circumstances directly bearing on the issue and tending to show mutuality in the understanding that no actual delivery of cotton was contemplated.

"Of necessity we have been compelled to read much of the evidence which includes many telegrams and letters passing between the parties, and we cannot resist the conclusion that from James' alleged notice to the agent Tate, and his telegrams and letters to the plaintiffs, and the course of dealings pursued by the parties and other matters shown, the jury might well

have found that James did not contemplate actual delivery of any cotton on the future contracts bought or sold for him by the plaintiffs, and only intended wagering or gambling on the fluctuations of prices of cotton futures, expecting to settle by the receipt or payment of differences, and that the plaintiffs were well advised thereof and well understood that in buying and selling for James' account no delivery was to be made or expected to be made, even if third parties should become interested in the future contracts entered into by them on James' account.

"Taking this view of the evidence, we are of opinion that the trial judge should have advised the jury in specific terms as to the public policy denying recovery on wagering contracts, defining the same, and also as to the right of recovery where parties willingly advance moneys to pay such contracts, and that on his failure to do so, coupled with his refusal of special charges hereinbefore considered, such reversible error supervened that a new trial should be granted."

On the second trial the evidence offered in the first as printed in the record was submitted to the jury, and in addition oral and documentary evidence was offered by the plaintiff tending to show that in the transactions on James' account the plaintiffs carefully followed the rules and regulations of the New York Cotton Exchange as to "ringing out" and substitution of future contracts, and that as matters developed notices by letter and telegram were given to James. All the books of Haven & Clement were submitted to the jury, and Sterrett Tate, the active agent of Haven & Clement, was again examined and cross-examined as to all the details of the case. And the defendant offered documentary evidence in relation to the same matters, and defendant James was again examined, cross-examined, and re-examined with regard to the whole merits of the case.

At the conclusion of the testimony, prior to the charge of the court to the jury, the defendant submitted to the court in writing a request to direct a verdict for the defendant, which request the court refused, and the defendant excepted, on the ground that the evidence demanded a verdict for the defendant. Thereupon, after argument of counsel, the court charged the jury as follows:

"Gentlemen of the jury: Under the law as laid down by the highest court of the land, the Supreme Court of the United States, and by the highest court of the state of New York, these contracts made in the New York Cotton Exchange are valid and binding when they are put in writing by slips of the character introduced in evidence here. It has been distinctly held, and is the law, that these slips are sufficient memoranda in writing to bind the parties and make a contract between the parties to these slips. The question has been made, under what we call the statute of frauds, that they would have to be in writing, and the courts hold that these slips are sufficient writing to make a valid contract. These contracts for the future delivery of cotton are sustained upon the ground that, under the laws of New York Cotton Exchange, the actual spot cotton can be required to be delivered, and therefore these contracts are sustained to be valid sales of a commodity if the commodity is demanded by the purchaser.

"The plaintiff claims that he was directed by the defendant, Mr. James, to make these contracts for the purchase and sale of cotton, as has been stated in the evidence. The evidence is before you on that subject. I do not understand it to be denied at all that Mr. James did order the purchases and sales as made, but that is for you to say under the evidence. And whether or not the plaintiff complied with these orders and directions of the defendant, James, for making the purchases and sales, that you must gather from the evidence also. It is incumbent upon the plaintiff to show you all of this, to

show it to your reasonable satisfaction by a preponderance of the evidence in the case.

"The defendant, as I understand it, contends, in the first place, that this was a wagering contract purely; that there was no intention on his part to deliver any cotton, or to have any delivered to him; that he was simply gambling on futures. This is the substance of his claim, and of his counsel's, as I understand it. He also states that what is called 'ringing out' in the cotton contracts on the New York Cotton Exchange is of such a character that it should defeat the plaintiff's right to recover against him, even if he is otherwise entitled to recover. As to this first matter of 'ringing out' or 'ringing up' as it seems to be sometimes called, it has been before the Supreme Court of the United States, and the highest court of the state of New York, and is fully sustained as a legal method of transacting this business. The Supreme Court of the United States says this: 'The ring settlement is reached by a comparison of books among the clerks of the members buying and selling in the pit, and picking out a series of transactions which begins and ends with dealings which can be set against each other by eliminating those between—as, if A. has sold to B. 5,000 bushels of May wheat, and B. has sold the same amount to C., and C. to D., and D. to A. Substituting D. for B. by novation, A.'s sale can be set against his purchase, on simply paying the difference in price.' That is to say, I understand this method of doing business to be treated by the courts, both the Supreme Court of the United States and the Supreme Court of New York, as an entirely legitimate method of transacting this part of the business. Unless you find something in what has been shown here in the evidence as to this ringing out or ringing up, it appears to me that it should have nothing to do with this transaction, and should not interfere with the plaintiffs' rights to recover, provided they are otherwise entitled to recover. Now, the claim has been made, if I understand the claim by the defendant in this case, that although, as I have just instructed you, this method of transmitting the business has been sustained by the courts, and this court should recognize it as legitimate, it is claimed by the defendant that what is called 'ringing out' extinguished these contracts that were made by Haven & Clement for Mr. James, that when the ringing out was made and the matter carried through, all these contracts that they had made for Mr. James were thereby extinguished. You have heard the testimony about that, and what was said about it by counsel on both sides. It is claimed on the part of the plaintiffs that this is not true, that the contracts provided that they shall remain in force until they were finally executed, notwithstanding this arrangement, that a contract to deliver on the part of a particular broker who sold to Haven & Clement, or their contract if they sold, existed and could be enforced under the rules of the Exchange, notwithstanding these contracts had, as they call it, been rung out. That is a matter for you to determine under the evidence. I instruct you, under the law as I understand it to be fully established by the courts of the United States and of the state where this occurred, that it is a legitimate way of doing business, whether or not it was followed legitimately in this particular case, or whether or not, as contended to you by counsel for the defendant, it was done in such a way as to extinguish any claim Mr. James might have had, or his brokers on his part, for what was due him. Of course, that is not legitimate. It has been assumed that the matter is so arranged—for example, one of the courts, in referring to it, likens it somewhat to a clearing house of the banks in cities where the banks have a clearing house arrangement, by which they settle their differences without having to give each one a separate check to square things up.

"Now another defense in this case on the part of the defendant is that this was a wagering contract pure and simple; that is, a gambling transaction, without any intention whatever, on the part of the defendant, to deliver cotton when sold, or to receive cotton when bought, and that the plaintiffs understood this to be his intention. If the jury find that James did not contemplate the delivery of any cotton on the future contracts bought and sold for him by the plaintiffs, and only intended to wager or gamble on the fluctuations in the price of cotton futures, expecting to settle by the receipt or payment of differences, and that the plaintiffs were advised

thereof and well understood that in buying and selling for James' ac-count no delivery was to be made or accepted by him, even if third par-ties should become interested in the future contracts entered into by them on James' account, then this arrangement would be one in which recovery could not be had for money advanced in this connection and to carry out these purchases and sales.

"Under the statute of Georgia (Code of 1910, § 4253) 'a contract which is against the policy of the law cannot be enforced. Such are contracts tending to corrupt legislation or the judiciary, contracts in general in restraint of trade, contracts to evade or oppose the revenue laws of another country, wagering contracts, contracts of maintenance or champerty.' 'Wagering con-tracts' you understand, betting contracts, and if this in the present case was one where there was no actual purchase or sale intended, it is simply a bet on the rise or fall of cotton. If the plaintiff has established its case so far as it is required to do so in the manner I have already indicated to you, that is to say, that they had orders from James to buy cotton on the New York Cotton Exchange and that James' orders were carried out, and that it was necessary for the plaintiff, in executing the same and carrying out the same, to pay out money for his account, and that this was all done properly and by the usual method recognized by the New York Cotton Exchange, then the burden would be shifted to the defendant to show his defense, as I have just indicated; that is, to show to your reasonable satisfaction that he did not intend, and that the plaintiff knew that he did not intend, to deliver any cotton or to receive any cotton on account of and as a result of these trans-actions of selling and buying, and that it was a wagering contract pure and simple. A wagering contract in this case would be one, of course, such as I have just described, where it was simply betting on the rise or fall of the market, and not a legitimate transaction under the law and under the rules of the New York Cotton Exchange.

"The defendant also claims, as I understand it, that when these contracts were closed out, on December 3d, they had allowed him to go beyond his margins. As I understand the defense, he claims he had an understanding with Mr. Tate that he must never allow him to go beyond his margins which he had put up with them, and I presume—but that is a matter for you gentle-men to determine; I do not know what the truth about that is, beyond the amount of credit they had given him. You remember they both agreed, Mr. James and Mr. Tate, that he agreed to give him a line of credit from $2,500 to $5,000. How far that is embraced in this matter of going beyond his margins I am unable to say. That will be a matter for you to determine under the evidence, whether he was not to go beyond the amount of money James had sent and this amount of credit, or whether he was not to go beyond the money actually sent. They were to notify him, and, if he did not increase his margins, they were to close him out, and that by allowing him to go beyond this he was injured. Of course, if they failed to carry out his instructions' so far as they reasonably could, and to the extent that he was injured by such failure and by going contrary to his instructions, they ought not to re-cover against him. What that will be, and that is material in the case, it will be for you to say, and to what extent he was injured by their failure to close out more promptly and before his margin was exhausted. This will be for you to determine from the evidence. Mr. Tate testified, as I under-stand it, to the contrary, except that he agreed with Mr. James that they were to allow him a line of credit of from $2,500 to $5,000.

· "Now, gentlemen, I have some requests to charge which I want to refer to here, and the most of them have been covered, at least the most of those I give have been covered; by the plaintiff to instruct you that, 'if you believe from the testimony that the defendant employed the plaintiffs to buy and sell cotton on the New York Cotton Exchange, in obedience to its by-laws, rules, and regulations, that employment implied an undertaking to indemnify them in respect to the execution of their agency, and also implied a promise to reimburse them for such expenditures as were necessary in the performance of the agency properly performed.' I so instruct you, that is right.

"Second. 'That a contract for the future delivery of a commodity is pre-sumed to be valid, and the burden is upon the party attacking the contract

to show its invalidity, and in order to render such a contract invalid there must appear to your satisfaction an intention on the part of both parties to wager. The test of invalidity is mutuality of illegal intent.' That is, it must be shown to your satisfaction that both parties agreed that it was to constitute an illegal contract. That is, in this case, that there should be no delivery of cotton at all, but that it was simply a wager on the rise and fall of cotton. The other defenses, of course, are not embraced in that, but that applies to its being a gambling contract.

"It is shown that certain telegrams going between the parties, relating to the transaction of the business covered by these contracts, 'were expressed in cypher and were composed of cypher words selected from Shepperson's Code of 1881, and I charge you that by the use of that code the defendant in this case commits himself to abide by his contracts if executed and entered into in all respects in accordance with the rules and regulations of the New York Cotton Exchange of force at the time of the execution of such contracts.' And, of course, that would also be the case with them, provided they carried out his instructions in accordance with such instructions and acted in accordance with such instructions, and acted in accordance with the rules of the exchange, according to this book of cypher used, they too agree to be bound by it. I have already instructed you that these slip contracts are sufficient to make a valid contract.

"The other instructions I have combine the idea that although the customer did not intend himself (Mr. James in this case) to deliver or receive cotton— deliver cotton sold or receive cotton bought, if he intended his broker to do that for him in New York, it would be the same thing as if he did it himself. That is true, of course.

"Now I have some requests from the defendant, and I instruct you accordingly: 'If the plaintiff is entitled to recover, he can do so only by proof of a claim or claims set up in his pleadings.' He is not entitled, of course, to anything not set out in his pleadings. 'And that is so, even though you might believe that such theory is supported by the evidence adduced on the trial of the case.' That is to say, that the rule of law is that he makes his case by his pleadings, and he must stand on that, and must make out a case according to his declaration.

"I am also requested to charge you that he must recover in accordance with the items set forth in his declaration. That is more general, and does not point out in what respect. Of course, that is correct law, that he must recover in accordance with the case he makes out and sets up.

"I have already instructed you, what I am requested to here, 'that speculating or wagering contracts are void, and a broker or commission merchant cannot recover for advancement made a customer on account of such contracts.' If there was no intention of buying or selling cotton, as I have instructed you, if it was simply a gambling matter, the plaintiff cannot recover.

"I am also requested to instruct you that they could not recover, as I understand the request, for any commissions (in this case $820 commissions, I believe), if the contract itself was invalid. That is, even if service is rendered, no commission could be recovered on any alleged contract that was of a wagering, illegal or immoral character.

"I am also requested to charge you that the promise of the defendant to pay this claim, if it was a gambling claim, would not be valid. That is true.

"I am requested to instruct you, again, as I have already done two or three times, that if no purchases or sales of cotton were contemplated by either party, or intended to be made, the plaintiff would not be entitled to recover; and it appears to be a fact here, I will state to you, but you have heard the evidence, that no actual cotton was delivered between the parties.

"I have another request to the same effect about this being a wagering contract, that if both parties knew, and these men understood about it, but the question here is— Mr. James says he did not intend to deliver any cotton, and did not intend to buy any cotton; but what the law requires is that that should be mutual, that both parties should agree to it. That I understand Mr. Tate to deny, but that is for you to determine what the truth about that is.

"I am requested to charge you that under the law of New York 'all wagers, bets or stakes made to depend upon any unknown or contingent event

whatever, shall be unlawful and all contracts for or on account of any money. so wagered, bet or staked, shall be void.' Counsel says that is a statute of New York, and I have no doubt that it is, and I so instruct you.

"I charge you again that wagering contracts (I have already done that), no matter where made, cannot be enforced under the laws of Georgia. The question for you is whether this was a wagering contract or not.

"Now, gentlemen, we have had a long time over this case, and I have tried to charge you about it as quickly as I could. You will consider all of the evidence, give it fair consideration, and if you think the plaintiff is entitled to recover you will have to determine the amount. You will see what the amount is; you will have the papers out with you; the papers there will show you the amount actually paid out by them, and what amount they received from Mr. James, and what amount he made on the transactions, where he made something; and, of course, if they paid the money out then, they paid out the full amount, less what he sent them and less what they made for him, with their commissions added, which I understand would be the amount they are entitled to recover if entitled to recover at all. If you do not believe they are entitled to recover, say 'We, the jury, find for the defendant,' and if you find they are entitled to recover, say, 'We, the jury, find for the plaintiff' and fix the amount."

To this charge defendant's counsel made special and specific exceptions, all of which were duly allowed. Among these were the following, to wit:

"'I charge you further, gentlemen of the jury, that every contract or agreement, whether or not in writing, whereby any person shall agree to buy or sell and deliver any cotton to any other person, when in fact it is not in good faith intended by the parties that an actual delivery of such cotton shall be made, is unlawful in the state of Georgia, whether made or to. be performed wholly within this state, or partly within or partly without this state. I further charge you that the law of Georgia prohibits any and all contracts or agreements for the purchase. or sale and delivery of any commodity or other thing of value on margins, commonly called "dealing in futures," when the intention or understanding of the parties is to receive or pay the difference between the agreed price and the market price at the time of settlement.'

"Defendant excepted to the refusal of the court to charge as thus requested, and insists that the language of said request correctly expresses the nature and character of plaintiffs' claim as sued on, and correctly defines the law applicable thereto, and was apt and pertinent under the pleadings and proof in the case.

"Fourteenth Exception.

"Prior to the charge of the court to the jury in said case, and prior to the argument of counsel, counsel for the defendant submitted to the court in writing, and thereby requested the court to give the jury, the following special instruction, to wit: 'I charge you that dealings, if wagering in character, are none the less so if made in or on the alleged New York Cotton Exchange. The forms they may take are immaterial and their natures are unchanged no matter what guise they may assume or in what shapes or transactions they may appear. If wagering in character the plaintiffs cannot recover thereon.'

"Defendant excepted to the refusal of the court to charge as thus requested, and insists that under the issues joined and proof submitted the language of said request was apt and pertinent and essential to proper consideration by the jury of defendant's pleas and defenses in the case.

"Fifteenth Exception.

"Prior to the charge of the court to the jury in said case, and prior to the argument of counsel, counsel for the defendant submitted to the court in writing, and thereby requested the court to give to the jury, the following special instruction, to wit: 'I charge you that, if you believe the alleged transactions were mutually wagering in character, it makes no difference in this

case that defendant may have taken his winnings, had he won. The law against wagering transactions is still to be enforced and is binding upon the jury, regardless of any such possibility. And I charge you to give such possibility no weight or consideration whatever.'"

The record shows further:

"After the jury had been first charged, and had retired to the jury room, and had considered their verdict, and had been out for a considerable length of time, the jury returned into the courtroom and the following proceedings were had:

"The Court: I am told that you want to be recharged upon some points of the case, gentlemen; can you tell me what it is?

"The Foreman: Your honor, it seems that some of them have not understood or have not heard—either did not hear or did not understand, but what particular part I could not say, the whole charge, if you could—

"A Juror: The illegality of the sale of the contract; if it was illegal, if the first party understands it that it is not to be delivered, and the second party in writing for the cotton, if he understood it wasn't to be delivered, would that make it illegal? That is the point.

"The Court: I do not know that I understand you. If the first party—

"A Juror: If he understood that no cotton was to be delivered by the first party?

"By the Court: If Mr. James understood?

"A Juror: Yes, sir.

"The Court: And the question is with reference to somebody else with whom they dealt—with whom Haven & Clement dealt?

"A Juror: Yes, sir.

"The Court: The party becoming liable in this ringing out business?

"A Juror: Yes, sir; I just wanted to know whether that would make it illegal for one of the parties not to feel responsible for the delivery of the cotton.

"The Foreman: As I understand it, would it be necessary for both parties to understand that the cotton was to be delivered or received, or just one, and the other party did not?

"The Court: What I instructed you about it is this: I can read it here."

The court then proceeded to recharge the jury as follows:

"It is absolutely necessary, in order that the contract should be invalid on the ground that it was a mere wagering agreement, that the knowledge or understanding that the cotton was not to be delivered should be mutual; both parties should know, if that is what the question is. So far as Haven & Clement and Mr. James are concerned, the plaintiff and defendant, it would be necessary— 'Another defense in this case on the part of the defendant is that this was a wagering contract pure and simple; that is, a gambling contract, without any intention whatever on the part of the defendant to deliver cotton when sold, or to receive cotton when he bought, and that the plaintiff understood this to be his intention. If the jury find that James did not contemplate the delivery of any cotton on the future contracts bought and sold for him by the plaintiffs, and only intended to wager or gamble on the fluctuations in the price of cotton futures, expecting to settle by the receipt or payment of differences, and that the plaintiffs were advised thereof (that is, Haven & Clement themselves, the plaintiffs, were advised thereof) and well understood that in buying and selling for James' account no delivery was to be made or accepted by him, even if third parties should become interested in the future contracts entered into by them on James' account, then this arrangement would be one in which recovery could not be had for money advanced in this connection and to carry out these purchases and sales.' That is to say, if you find that the plaintiffs have established their case—that is to say, they have shown that they had those orders from James to buy and sell cotton respectively, and that they proceeded to execute those orders in a proper way, faithfully and right, and if, as a result of that, they paid out for him on those accounts, as they claim here, this amount of money which is claim-

ed, the balance of which is claimed here, then they would make out their case so far as they are concerned, and it would be up to this defendant. Under the rules of the New York Cotton Exchange, as I have stated to you, or rather the practice in the New York Cotton Exchange and the rules of the exchange have been upheld by the Supreme Court of the state of New York, and by the highest court in the state, the Court of Appeals, and these contracts held to be valid contracts upon the ground, as I stated to you, that the delivery of cotton can be required under them and under the charter of the New York Cotton Exchange and under the laws as applicable thereto.

"Now, when it comes to this case, as I have stated to you in my charge, when the plaintiff makes out his case, the defendant sets up three different defenses. The first one is that it was a gambling contract, a wagering contract. It would have to be substantiated and established, not only that Mr. James himself did not intend to deliver or receive, whatever the case may be, but it would be necessary that both he and the plaintiffs in this case, the brokers, should understand that there was to be no delivery of cotton and no receipt of cotton under the transactions under the rules of the exchange, and it was simply a gambling contract and he was betting on conditions."

From an adverse verdict and judgment for the full amount of plaintiffs' claim, this present writ of error is prosecuted.

[1] From the view we take of this case it is not necessary to pass upon other assignments of error than the one claiming there was reversible error in refusing the motion in writing made at the conclusion of the testimony to instruct the jury to find a verdict for the defendant on the ground that the evidence demanded such verdict. It is noted above in our former opinion, on the evidence then presented in the record, we decided that "the jury might well have found that James did not contemplate actual delivery of any cotton on the future contracts bought or sold for him by the plaintiffs, and only intended wagering or gambling on the fluctuations of prices of cotton futures, expecting to settle by the receipt or payment of differences, and that the plaintiffs were well advised thereof, and well understood that in buying and selling for James' account no delivery was to be made or expected to be made," and that we reversed the case because in respect to wagering contracts the jury was not sufficiently and properly instructed; and it is rather apparent that if, on the first trial, the defendant had asked for an instructed verdict on the ground that the proof showed a wagering contract, it would have received our sanction.

Upon the second trial now under review the same evidence was offered as on the first trial, supplemented by the plaintiffs by details as to the exact correctness with which they followed the rules of the New York Cotton Exchange, and supplemented by the defendant with more details on the issues urged by him, but practically and substantially all the evidence as to the intentions of the parties and the earmarks showing such intentions as to the purchase and contemplated delivery of cotton on the one hand, or gambling in cotton futures on the other, was substantially as on the first trial. That the whole business of dealing in cotton futures between Haven & Clement on the one side and James on the other was in fact and in result a wagering business is practically undisputed. No one can read the evidence and reasonably reach a contrary conclusion. It is undisputed that James from the beginning so intended, and so informed Tate, the agent of Haven

& Clement who solicited and obtained the business for his principal. Tate was examined on both trials, and although examined at great length and detail, frequently taking refuge in a "bad memory on account of lapse of time," yet nowhere did he deny that James so informed him, but asserted strongly that he did not tell his principal. Haven, senior partner of the firm of Haven & Clement, was examined at length on the first trial, and his evidence so taken was admitted on the second trial, and nowhere does he deny his knowledge that the James' business was wagering or dealing in cotton futures; but he does testify, when asked in reference to the James correspondence, as follows:

"Q. Did not Mr. Tate do the letter writing and the telegraphing? A. Mr. Tate did the letter writing and he referred the letters to me and— Well, the clerks did the telegraphing. Mr. Tate had charge of the business for Haven & Clement. I didn't undertake to attend to the details of it at all. Therefore this was Mr. Tate's work, the carrying on of the correspondence. He wrote the letters and dictated the telegrams to these men, and he knew more about that than anybody.

The general rule is that "the knowledge of the agent is the knowledge of the principal," and there is nothing in this case to take it out of the rule. See Wright Blodgett Co. v. United States, 236 U. S. 397, 35 Sup. Ct. 339, 59 L. Ed. ——. To induce James to deal in cotton futures through the firm of Haven & Clement, Agent Tate offered James a line of credit up to $5,000, which Haven & Clement confirmed by letter as follows:

"August 17, 1904.

"D. W. James, Blakely, Ga.—Dear Sir: Soon after returning from his Southern trip, which occurred a few days ago, our Mr. Tate called our attention to an important omission in the letters we wrote you soon after he had conferred with you when in Blakely, viz.: That we had overlooked mentioning the arrangement which he made with you to give you a credit up to $5,000 on trades which you might make through our house in the cotton market. We now beg to confirm what Mr. Tate said to you on that subject, the understanding being that, when we have executed your orders in cotton, we are to call on you for margin as soon as $5,000 is necessary to protect the contracts we are carrying for you at the market or when accounts are closed. We trust that this will be satisfactory, and that we shall receive your commands when you are doing anything in cotton. We shall certainly give your account our best attention and remain,

"Yours very truly, [Signed] Haven & Clement."

Does the expression "trades in the cotton market" cover the purchase or sale of cotton when actual delivery is intended? And is it customary for brokers to give credit covering margins when actual delivery is contemplated? No witness has so testified. The letters and telegrams from Haven & Clement to James during the course of business in 1904 show that they understood and fully appreciated the fact, and they go far to indicate actual knowledge, that James was gambling in cotton futures, to wit:

August 6th:

"We would not be surprised if the price went a little higher, but we consider cotton a sale on any bulge of that character."

### October 6th, confirming telegram:

"Lower prices seem inevitable and it is likely that this decline will go to an exaggeratedly low price."

### October 12th:

"This market at present looks as though it would ease off by degrees barring no bad weather, but it does not look as though it will sell much below ten cents, and if it breaks to ten cents again we would advise that you buy more cotton, but buy January or beyond."

### October 14th, after naming conditions in the market:

"We believe in purchase on every break; buy the far months."

### November 2d:

"Sentiment as to cotton has greatly changed in the last few days, and it looks as though the market will be pushed up some higher; but during the congested condition of spots it is not likely there will be any great and extended advance, but reactions from time to time, making the market a good scalp."

### November 16th:

"This has been one of the most rushed and quickly marketed crops on record, and of course a great deal of cotton has accumulated everywhere; but the end is now, or soon will be, in sight, and the big crop estimators will be a thing of the past. Therefore we think this market is a purchase on every easy spot. If the American mills ever start to buy, we will see a remarkable advance; also if the farmers hold, if they are able to do, they can shape prices for 2 cents per pound in advance."

### And after James was closed out December 5th:

"The bear force is well organized and hammer prices on every rally. We are just in receipt of a telegram from Oklahoma stating that snow, sleet, and rain there will rot unopened bolls and they think market would be a sale at least for the present."

Concerning these letters counsel for plaintiff in error very forcibly says:

"Throughout all these letters, the phraseology, verbiage, vernacular—yea, the very atmosphere of every expression, each and all—belie the suggestion of any intention to deal in anything but speculative transactions, and no other conclusion can be reached by a mind seeking for the truth."

All the books of Haven & Clement showing the James transactions were in evidence, and their bookkeeper, Binning, in explaining the cotton future blotter, testified:

"I said we had a general blotter. That is a cotton blotter. Q. Spot cotton, you mean, or futures? A. Futures. As to how that book is arranged, on the top of the page is the date. As to that (what) follows that—if a man makes a loss of a certain amount of money, we charge him with it on that book. In addition to the lines across the page, there is a column for the number of bales which is traded in, a column for the option, the column for the money, and a column for whose account. And there is one column for his name. The next is the column for the bookkeeper's posting check mark, his initials. There is a column in front for the date. It is usually dated at the top, if we are busy; if we are not busy, it would be dated on the side. I made the entries in that book from the account sales. I would enter in that book the charges against all customers one right after another on one page, if they lost money. Q. Suppose they won? A. They were credited in that book. Q On the same page; on the opposite page? A. The opposite page. Q. Then the

losses were on the left-hand side and the profits were on the right-hand side? A. The losses were on the left-hand side and the profits were on the right-hand side. I prefer to say profits, instead of won."

And the record teems with much other pointed evidence in line with Mr. Binning. In Williamson v. Majors, 169 Fed. 762, 95 C. C. A. 186, in deciding in a similar case as to knowledge necessarily derived from the way the cotton future business was handled by the parties, this court said:

"From what has been recited, it is clear that, in his buying and selling cotton futures, Williamson, who was in the real estate business, and not in the cotton business, had no intention to actually buy or sell cotton, but was merely speculating on the rise and fall of the cotton market, intending to settle by receiving or paying differences—in fact, gambling in cotton futures; and it seems clear that Bettis Majors knew all about it. Certainly, from a mere inspection of Williamson's orders, he ought to have known it. Under the evidence, to assume his ignorance of Williamson's gambling would be a reflection on his intelligence. Knowing the nature of Williamson's dealings in cotton futures, he facilitated, if not encouraged, him, furnished credit and money to carry on the same, and, finally, took the transactions off his hands by 'closing out' as to Williamson and 'taking them over' to himself."

As opposed to this view, it is contended: (1) That these transactions could not be gambling transactions, because by understanding and agreement they were to be purchases and sales of cotton futures that were to be conducted according to the rules and under the regulations of the New York Cotton Exchange, which exchange it is contended contemplates the actual delivery of cotton under any contract made according to its rules; (2) that there have been two verdicts by juries in favor of Haven & Clement.

[2] 1. In considering the first-mentioned contention, it is to be borne in mind that the real nature of the transactions in question is not to be determined by looking at only the forms and words made use of in the contracts entered into. What the parties really intended is shown by what they said and did before the dealing started and while it was going on. It is not open to reasonable question that the evidence above referred to strongly indicates that, though under James' orders contracts were made which called for the future receipt or delivery of cotton "subject to the by-laws and rules of the New York Cotton Exchange," Haven & Clement, equally with James, never had in contemplation any actual delivery of cotton as a result of any of the transactions between them, but that the understanding of both parties to those transactions was that they would be closed by the receipt or payment of the difference between the contract price and the market price at the closing-out time. No attempt has been made to reconcile the claim now urged in behalf of Haven & Clement, that they contemplated actual deliveries of cotton, with some of the facts disclosed by undisputed evidence, notably that furnished by letters written to James while the dealing was in progress, which contained such suggestions to him as the one to buy more cotton on breaks in the market, the one to sell on bulges in the market, and the one to the effect that stated conditions made "the market a good scalp." The uncontradicted testimony of a witness introduced by Haven & Clement makes it

plain that no member of the exchange could really expect deliveries of cotton to be made as the result of scalping operations, which confessedly are quick ventures in the market, entered upon with no expectation of receiving or delivering the thing contracted about, but intended to be closed by the payment or receipt of the differences in prices resulting from the market fluctuations. .

The evidence which has been referred to even more convincingly points to the conclusion that Haven & Clement understood that no delivery of cotton was to be expected as a result of James' ventures, when that evidence is considered in connection with that which disclosed the disposition which Haven & Clement made of the contracts they entered into in executing James' initial orders. The balance claimed by Haven & Clement to be due to them from James arose out of what the former did in executing the latter's orders to buy cotton for future delivery and his subsequent orders to close out the transactions so entered upon. Haven & Clement executed those orders of James by entering into contracts with other members of the Cotton Exchange, who thereby obligated themselves to deliver, at the times indicated in James' orders, to Haven & Clement, "subject to the by-laws and rules, New York Cotton Exchange," the number of bales stated in James' orders. The result, so far, was that Haven & Clement, as brokers, held for James, their customer, the obligations of other members of the exchange to deliver cotton in the future to Haven & Clement, "subject to the by-laws and rules" of the Exchange. While the matter remained in this situation, Haven & Clement are to be regarded as brokers holding for their customer contracts enforceable by them in behalf of the customer. But Haven & Clement, before receiving any further order or instruction from James with reference to such contracts, reported to him as having been entered into for his account and risk, so dealt with the contracts as to terminate all right to enforce them against the other members of the Exchange who had incurred liability under them. Each of those contracts for the future delivery of cotton to Haven & Clement was without any order from James, canceled by being set off against other contracts by which Haven & Clement had similarly obligated themselves to other members of the Exchange; the differences between the prices respectively stated in the contracts so set off against each other being paid to the member of the Exchange whose contract obligated him to buy at the lower price. And the evidence on the subject was such as to leave no room for reasonable doubt that Haven & Clement so terminated the existence of the contracts as soon after they were entered into as the opportunity to do so was afforded. This disposition of the contracts left in existence no contract under which either Haven & Clement, as brokers for James, their undisclosed principal, or James himself, could expect a future delivery of cotton to James, or to Haven & Clement on his account, unless another enforceable obligation for the future delivery of cotton was substituted in the place of those which were extinguished.

It is urged in behalf of Haven & Clement that there was such a substitution; that they themselves, by force of by-laws and rules of the New York Cotton Exchange, subject to which the extinguished con-

tracts were made, were substituted as parties obligated to make deliveries to James of the cotton which had been contracted for on his account. This contention is based upon the presence in the by-laws and rules referred to of certain provisions which are applicable when a member of the exchange offsets and settles a contract which he had made on the order and for the account of a customer. One of these provisions is to the effect that when this is done:

"Thereupon the said member, or his firm, if he is trading in the name of a firm of which he is a member, shall be substituted in the place of the said party from whom such purchase or to whom such sale was originally made, and shall be deemed a party to the contract for all purposes."

Another provision is the following one:

"Any member who may find that he holds, for account of his correspondents, contracts, both of sale and purchase, in the same month which offset each other, shall be authorized to offset and settle such contracts and to substitute therefor his own name, and he shall be responsible to his principals for the strict fulfillment of such contracts, and shall be liable to them for all damage or loss they may sustain by reason of such substitution."

The nature of the substitution resulting from the operation of the provisions just quoted cannot be determined without according due effect to other by-laws and rules of the Exchange which are equally applicable. A by-law of the Exchange explicitly provides that no contract for the future delivery of cotton shall be enforced by the exchange, or by any committee or officer thereof, unless both parties thereto shall be members of the New York Cotton Exchange. It is plain from the rules which prescribe the steps required in making such deliveries of cotton or warehouse receipts therefor as the contracts made between members of the Exchange can be regarded as calling for cannot be taken except by and between members of the Exchange. No outsider can intrude himself, can be either the giver or the recipient of one of the transferable notices of delivery by the use of which alone there can be brought about such a delivery as is contemplated under a contract for the future delivery or receipt of cotton made between members of the Exchange and subject to its by-laws and rules. Nothing in the provisions for substitution indicates that the substituted member's resulting obligation to his customers is other or in any respect different from the elaborately conditioned and qualified obligation which another member was under until the contract he made was settled and canceled.

We have not been referred to, nor have we discovered, any provision which purports to have the effect of substituting Haven & Clement, as the result of their settling with another member of the Exchange who had contracted with them for the future delivery of cotton, to any obligation other than the one which that other member had been under. Plainly that other member's obligation was not enforceable, except in behalf of one who was a member of the Exchange. It seems equally plain that the obligation to which Haven & Clement were subjected by way of substitution could not, because of the fact that James was not a member of the Exchange, entitle him to the only kind of delivery of cotton or warehouse receipts for it which is in con-

templation when a contract for future delivery is entered into between members of the Exchange. It seems necessarily to follow that the by-laws and rules of the Exchange, in providing for a substitution and at the same time making any contract for the delivery of cotton which is governed by them unenforceable by one not a member of the Exchange, are to be understood as contemplating a substitution so narrowly limited and qualified that it cannot be regarded as conferring upon the customer any right to demand or expect the only kind of delivery which any one had contracted to make, or as giving rise to any liability of the substituted member other than to compensate his customer for such loss or damage as the latter may sustain in consequence of the cancellation of the contract which had been made on his order and at his risk. It cannot well be inferred that a broker would under such circumstances so cancel a contract he held for his customer unless the understanding between them was that no delivery of the commodity contracted for was to be made, and that the only anticipated outcome of the transaction was the payment or receipt of the difference between the contract and the market price.

The result of Haven & Clement's disposition of the contracts was as effectual a deprivation of James of the benefit of any contract under which a delivery of cotton to him or on his account could be enforced or reasonably expected as was disclosed by the evidence in the case of Higgins v. McCrea, 116 U. S. 671, 6 Sup. Ct. 557, 29 L. Ed. 764, which showed a similar cancellation of a contract by a broker, unaccompanied by any pretense of a substitution. The ruling made in the case of Board of Trade v. Christie Grain & Stock Company, 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, furnishes support for the contention that the contracts made by Haven & Clement on James' orders to buy cotton for future delivery are not proved to have been of a gambling nature by the circumstance, standing by itself, that those contracts were entered into with the expectation that they might or would be satisfied by set-off or ringing. But nothing said or decided in that case is opposed to the conclusion that such a cancellation by a broker, without any order from his customer and unaccompanied by any substitution in the place of the canceled contract of another enforceable contract for the delivery of the thing nominally dealt in, is persuasive evidence of the broker's understanding that no actual delivery of such thing was really in contemplation.

We do not understand that the contention is made that the New York Cotton Exchange does not afford convenient facilities for carrying on gambling operations in cotton futures. The evidence in this case conclusively shows that a very small percentage of the immense number of contracts made on that exchange for the future delivery of cotton result in the actual delivery of any cotton. If such a venture is entered upon and prosecuted with the understanding between the principal and his broker, by whose agency the transaction is carried on, that no delivery or receipt, as the case may be, of cotton is expected to occur, but that the dealing is to be concluded by the payment or receipt of the difference between the contract price and the market price at the time of settlement, the trans-

action is a wagering or gambling one, and is rendered none the less such a one by the circumstances that it is carried on by means of contracts which on their face call for the actual delivery or receipt of cotton. Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. Ed. 819.

2. The jury in the first trial was not properly charged in respect to the law of Georgia with regard to wagering contracts, and a new trial was granted for that reason. The verdict rendered under such circumstances is not entitled to much consideration as a finding by the triers of the facts that the transaction in question was not in its nature a wagering or gambling one. It is true that on the trial which is now under review the judge charged the jury directly and specifically with regard to wagering, but through the ingenuity of counsel in pressing their respective theories of the case in requested and specific charges, the instructions on this subject were so mixed and confused with others laying special emphasis on the significance of the inquiry as to whether Haven & Clement's disposition of the contracts they entered into on James' initial orders did or did not conform to the by-laws and rules of the Exchange as to make it very probable that the jury was left under the impression that if they found from the evidence that there was such conformity—which the evidence plainly tended to prove—this would require the further conclusion that the transaction in question was not a gambling one. This is evidenced by the fact, as above fully set forth, that after deliberating a considerable time they came back into the courtroom and asked for further instructions as to the effect of third parties being interested in the contracts and as to the legality of the same. They were recharged specifically on the wagering defense, but the legality of the transactions was stressed as follows:

"That is to say, if you find that the plaintiffs have established their case, that is to say, they have shown that they had those orders from James to buy and sell cotton respectively, and that they proceeded to execute those orders in a proper way, faithfully and right, and if, as a result of that, they paid out for him on those accounts, as they claim here, this amount of money which is claimed, the balance of which is claimed here, then they would make out their case so far as they are concerned, and it would be up to this defendant. Under the rules of the New York Cotton Exchange, as I have stated to you, or rather the practice of the New York Cotton Exchange, and the rules of the Exchange have been upheld by the Supreme Court of the state of New York and by the highest court in the state, the Court of Appeals, and these contracts held to be valid contracts upon the ground, as I stated to you, that the delivery of cotton can be required under them, and under the charter of the New York Cotton Exchange, and under the laws as applicable thereto."

In view of the evidence in the case, the verdict seems to show that confusion still prevailed in their minds as to the law propositions by which they were required to be governed. However this may be, on the whole record, we conclude that the undisputed evidence was such as clearly and fully to show to every reasonable and impartial mind that Haven & Clement on the one side, and James on the other, had no intention or expectation that any cotton would actually be delivered, and that the whole business in controversy was only wagering on the

rise and fall of the prices of cotton futures in the New York Cotton Exchange market.

The judgment of the District Court is reversed, and the cause is remanded, with instructions to grant a new trial, and thereafter proceed in accordance with the views expressed in this opinion.