## ALEX HYMAN & CO. v. HAY.

(Circuit Court of Appeals, Fifth Circuit. January 13, 1922.)

No. 3788.

1. **Gaming ☞12—Transaction valid in form may be shown to be wagering contract.**

   The fact that purchases and sales of cotton for future delivery were made on an exchange, by whose rules contracts where actual delivery is not intended are prohibited, is not conclusive that the transactions were within the rules, and where there is evidence tending to show that, though valid contracts in form, they were in fact mere wagers, the question is ordinarily one for the jury.

2. **Sales ☞53(1)—Who were the actual parties to contracts held a question for the jury.**

   Whether transaction between plaintiffs, who were numbers of a cotton exchange, and defendant, who deposited margins to cover purchases or sales of cotton for future delivery, were between the parties as principals, or between defendant, through plaintiffs as brokers, and some undisclosed principal, *held* a question for the jury.

3. **Principal and agent ☞177(3)—Knowledge of agent held to bind principal.**

   Where defendant deposited margins to cover purchases or sales of cotton for future delivery with agents of plaintiffs, the knowledge and understanding of the agents that defendant did not intend to make or accept actual delivery of the cotton; but merely to speculate on the rise or fall of the market, *held* to bind plaintiffs and to characterize the transactions.

In Error to the District Court of the United States for the Southern District of Mississippi; Edwin R. Holmes, Judge.

Action at law by Alex Hyman & Co. against J. C. Hay. Judgment for defendant, and plaintiffs bring error. Affirmed.

L. C. Going, of Memphis, Tenn., for plaintiffs in error.
H. P. Farish, of Greenville, Miss., for defendant in error.

Before WALKER, BRYAN, and KING, Circuit Judges.

BRYAN, Circuit Judge. This suit arose out of alleged purchases and sales of cotton for future delivery. Plaintiffs, who are plaintiffs in error here, are partners and members of the New Orleans Cotton Exchange. The declaration alleges that the defendant is indebted to the plaintiffs—

"in the sum of $4,665, being the balance he owes them for money which they expended and services which they performed for him and at his request in and about the purchase and sale of six hundred (600) bales of cotton, which they purchased and sold for him and at his instance and request upon the New Orleans Cotton Exchange and in accordance with its rules and regulations," etc.

Defendant pleaded the general issue, and also interposed special pleas alleging that plaintiffs were seeking to recover for losses incurred by them on contracts for the purchase and sale of cotton for future delivery; that plaintiffs and defendant did not intend that cotton

should be delivered and paid for, but intended only that one party should pay to the other the difference between the contract price and the market price when the time fixed for delivery arrived.

The constitution of the New Orleans Cotton Exchange, filed in evidence, among other things, provides that no contract shall be enforced by the Exchange except between members thereof; that no contract shall be entered into between members with the stipulation or understanding that it is not to be fulfilled, and the cotton received or delivered, but contracts, alike except as to price, held by members of the Exchange against each other, are required to be closed out and canceled upon notice at any time before delivery; and that prior to or at the time of the signing of a contract either party thereto may be required to put up an original margin of from $1 to $5 for each bale of cotton bought or sold.

There was evidence that plaintiffs purchased cotton for defendant, to be delivered on the following dates and in the following quantities: December 9, 1916, 200 bales for March delivery; December 19, 1916, 200 bales for May delivery; February 21, 1917, 200 bales for July delivery; and May 18, 1917, 200 bales for July delivery—and that they sold cotton for defendant, to be delivered on the following dates and in the following quantities: February 3, 1917, 400 bales for July delivery; February 21, 1917, 200 bales for March delivery; and May 18, 1917, 200 bales for May delivery.

Plaintiffs exchanged with other members of the Cotton Exchange bought and sold slips, according to which the purchases and sales just above mentioned were made, the obligation to receive or deliver cotton being "subject to the by-laws, rules and conditions of the New Orleans Cotton Exchange," etc. Such members are not represented to be acting as agents or brokers. No other names appear thereon, and it is not stated that the members are acting for undisclosed principals.

The purchases and sales in question were made by plaintiffs upon telegraphic requests from Kellner & Vincent, who also represented themselves to be agents or brokers for the purchase and sale of cotton for future delivery, at Greenville, Miss., near which place defendant resided. Telegrams, purporting to have been signed by defendant and authorizing purchases of cotton, were filed in evidence; but they were actually prepared and sent by Kellner & Vincent. In letters of the same date to defendant, plaintiffs acknowledged receipt of the orders through Kellner & Vincent.

It does not appear that all the sales were made upon orders given by defendant. As to the first order, that of February 3, 1917, plaintiffs offered in evidence a telegram, purporting to be from defendant, to sell 400 bales. In a letter of that date plaintiffs state:

"We beg to confirm telegrams exchanged to-day, resulting in transactions made for your account as per confirmation inclosed, for which we thank you, and have placed same through account of Messrs. Kellner & Vincent. Inasmuch as this hedges your contract, we presume that you desire the open orders which you have entered, to sell 200 May at 18.30 and 200 March at the same time, to be canceled, and have accordingly done so. If, however,

this is not in accordance with your wishes, kindly advise us, and we will reinstate the order."

The second sale was authorized by telegram from Kellner & Vincent reading:

"Sell two March and buy 2 July hedge account Hay."

The manner in which the last sale was made is shown by a letter from plaintiffs, in which they state:

"We wrote Messrs. Kellner & Vincent regarding the 200 May long and 200 July short several days ago, so that they could see you and advise the taking out of this straddle. * * * We received a letter from them, in which they stated for us to use our own discretion in the covering of these contracts, and we accordingly covered this morning at a difference of 37 points, as per confirmation inclosed; after this they narrowed as low as 23, and close to-night at-approximately 28 points," etc.

After the transactions were over, plaintiffs wrote to defendant in an effort to secure the payment of their claim. In a letter of April 1, 1919, they stated:

"Referring to past correspondence in regard to the visit which our Mr. Hyman paid you some time ago, wherein it was his understanding that when you disposed of some of your spot cotton that you would make us some payments against your indebtedness, and you having further advised that you would take the matter up with Messrs. Kellner & Vincent, at Greenville, we understand that there has been some better demand of late, and no doubt you had some opportunities of disposing of some of your spot cotton, and will be in a position to make us substantial payments against your account. * * * As we have not heard from our mutual friends, Messrs. Kellner & Vincent, of late in regard to this matter, we are sending them a copy of this letter."

And again, on June 3, 1919, plaintiffs wrote defendant a letter in which they state:

"You will no doubt recall that it was the understanding of our Mr. Hyman, when he saw you in person, that when you disposed of some of your spot cotton that you would make us some payments against your indebtedness, and you further advised that you would take the matter up with Messrs. Kellner & Vincent at Greenville, Miss."

One of the plaintiffs testified that Kellner & Vincent were entitled to a share of the commissions, but that they were the agents of defendant, while defendant testified that Kellner & Vincent were the agents of plaintiffs. Vincent did not testify, but Kellner testified upon this point that he expected to be paid for his services by the plaintiffs. Defendant denied that he ordered any sales to be made, and claimed that the sales, if any, were made because of his failure to put up margins.

Plaintiffs reported on form letters to defendant, in which they gave accounts of the various transactions, merely stating the number of bales bought or sold, the month of delivery, and the price. Each of the letters contained the following paragraph:

"It is further understood that on all marginal business the right is reserved to close transactions when margins are running out, without further notice, and to settle contracts in accordance with the requirements of the

United States Cotton Futures Act (section 5) and the rules and customs of the Exchange where orders are executed."

Defendant was never informed who the parties were with whom it is claimed the contracts of purchase and sale were made. It is admitted that in the month of December, 1916, defendant in error made five payments, aggregating $4,000, on account of margins, and did not make any payments thereafter. March 26, 1917, plaintiffs wrote to defendant a letter which stated their claim as of that date, as follows:

"Inasmuch as March contracts expired before noon to-day, and you being 200 long and 200 short, we are compelled to render account sale of this transaction, and inclose you sale of 200 March, showing a loss of $2,610, which has been debited accordingly."

The transactions between the parties were completed on May 18, 1917. In a letter of that date plaintiffs stated:

"We also inclose account sale covering 200 July which you were long and 200 short; this leaves your account a net debit of $4,665."

In letters written from time to time, usually when they had occasion to acknowledge payments made to Kellner & Vincent, plaintiffs advised defendant of market conditions. A letter of December 12, 1916, contained the following:

"The market did not respond in the early session to the rumors of Germany's peace proposals, but in fact showed a decline from the time this report was issued. But liquidation had apparently run its course for the time being, and when it was seen that spots in the interior were not showing any signs of distress, and Liverpool became a buyer in the American markets in the later session, it caused some nervousness among recent shorts, who in attempting to cover found little for sale, with the result the market closes at an advance of some 61 points from last night and about 110 to 114 points from yesterday's low level."

In a letter of December 22, 1916, plaintiffs stated:

"Secretary Lansing's explanation of his statement yesterday induced a better feeling. However, the market continued to rule nervous and erratic."

A letter of February 21, 1917, was in part as follows:

"The steadiness in the market to-day was attributed to continued reports of the firmness in the spot department, good exports, lack of need in Texas, and the absence of any unfavorable political news."

A witness for plaintiffs testified that it would have been a violation of the rules of the Cotton Exchange for his firm—

"to have received and executed an order for the purchase and sale of cotton when he knew the person represented did not intend to accept or deliver, as the case may be, the cotton which he bought or sold, and no reputable broker on the New Orleans Cotton Exchange would think of accepting an order for the purchase or sale of cotton, when he even had reason to believe that the person he represented was not acting in good faith in making the contract."

Kellner testified that he had been in the cotton business for 35 or 40 years; that he had no reason to believe that on any of the orders he had handled it was intended to make deliveries, or that the parties to these contracts intended to deliver cotton; and that he knew of no

actual deliveries of cotton in Greenville about that time upon transactions which he was handling.

Defendant testified that he was a cotton farmer; that he had speculated from time to time in cotton futures; that in the transactions in question he had paid $4,000 to Kellner & Vincent in installments on margins, and produced checks aggregating that amount, all payable to and indorsed by Kellner & Vincent only; that he had no idea of receiving the cotton, and was merely intending to gamble on the rise and fall of the market, and to settle on the difference between the contract price and the market price; that he was financially unable to have paid for the cotton represented in the transactions which took place between him and Kellner & Vincent; and that the latter knew he was unable to do so.

A member of plaintiffs' firm testified:

"No delivery could have been demanded by us, and no delivery could have been required of us from the persons to whom we sold it."

In giving his reason for that statement he said:

"Because the contracts made by us for Mr. Hay were never carried to maturity, and no tender to us or by us was made necessary."

No cotton was delivered or tendered.

At the close of the evidence plaintiffs moved for a directed verdict in their favor, which the court denied, and the case was submitted to the jury upon the testimony above outlined. There was a verdict for the defendant, upon which judgment was entered.

The court charged the jury in effect that the alleged purchases and sales were presumed to be valid; that the burden of proving their invalidity was upon the defendant; that it was not sufficient to defeat recovery by the plaintiffs for the defendant to prove that he alone did not intend to accept or make delivery of cotton, as the case might be, but that it was necessary for the defendant further to prove that the plaintiffs did not intend to make or accept delivery of the actual cotton represented by the various bought and sold slips which were exchanged between plaintiffs and other members of the New Orleans Cotton Exchange.

It is not contended that the court committed any error in its charge to the jury upon the law, but only that the court should have instructed the jury peremptorily to find for the plaintiffs. It is conceded, if plaintiffs were not entitled to a directed verdict, that the case was fairly submitted to the jury and that the judgment should be affirmed. It is to be determined, therefore, whether there was any substantial evidence which authorized a verdict and judgment for the defendant.

In the briefs there is some discussion as to whether the contracts relied upon are governed by the laws of Mississippi or of Louisiana. But the difference, if any, between the laws of the two states, is unimportant in this case, because in either of them contracts for the future delivery of cotton, where the parties thereto have not the intention of making such delivery, are void, as such contracts are generally, if not universally, held to be in all the states. If there was any error in re-

fusing to enforce the provisions of the Mississippi Code, it was committed against defendant, and in favor of plaintiffs, and of such an error, of course, the latter cannot complain.

[1] It is argued that a verdict should have been directed for the plaintiffs, because under the rules of the New Orleans Cotton Exchange contracts are forbidden, if the parties do not intend to make actual deliveries. Upon this subject we quote from the leading case of Irwin v. Williar, 110 U. S. 499; 4 Sup. Ct. 160, 28 L. Ed. 225:

"We do not doubt that the question, whether the transactions came within the definition of wagers, is one that may be determined upon the circumstances, the jury drawing all proper inferences as to the real intent and meaning of the parties; for, as was properly said in the charge: 'It makes no difference that a bet or wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade.' It might therefore be the case that a series of transactions, such as that described in the present record, might present a succession of contracts, perfectly valid in form, but which on the face of the whole, taken together, and in connection with all the attending circumstances, might disclose indubitable evidence that they were mere wagers."

We are of opinion, therefore, that it was a question for the jury to decide whether the real contracts were as represented by the rules of the New Orleans Cotton Exchange, or whether these rules, covering dealings only between members thereof, and denouncing contracts for future delivery made without intention of compliance therewith, were used as mere subterfuges, devised to evade the laws applicable to wagering contracts.

[2] It is also contended that plaintiffs were defendant's brokers, that defendant's contracts were with undisclosed principals, and that it was necessary for him to prove the intention of these undisclosed principals not to accept or make deliveries of cotton. Of course, that would place a burden upon defendant that he not only did not meet, but that he could not possibly have met. To uphold such a contention would obviously be to strike down all laws which prohibit wagering contracts. Dealings on a cotton exchange are between its members, who contract subject to its rules and regulations, one of which is that they have the right to demand ring settlements and to cancel contracts, and this right is very carefully preserved in the bought and sold slips, which are always subject to the rules of the Exchange, and in this case in the letters from plaintiffs to defendant. But forms not being conclusive, or even important, the jury had the right to look through them into the real transactions, and it was within their province to find that the contracts were actually between the plaintiffs and the defendant. The defendant was purchaser of cotton for future delivery under all the evidence, and the seller of cotton for future delivery under evidence furnished by plaintiffs, but disputed by defendant. If, then, the contracts be considered between the parties to this suit, and not between the defendant, through the plaintiffs, and some undisclosed principal, the question becomes important whether Keilner & Vincent were the agents of plaintiffs or of defendant.

Passing by the testimony of the parties to the record, in which they state mere conclusions, to the other evidence, from which the circum-

stances reliably appear, it is not apparent to us that there was no substantial evidence warranting the jury in finding that Kellner & Vincent, in the operations which they carried on at Greenville, were the agents of the plaintiffs. This firm operated one of the many establishments found throughout the country, where those who desire to do so can give orders for the purchase and sale of commodities for future delivery. These agents were not to be paid by the defendant, and they were not accepting and telegraphing orders with no expectation of being remunerated therefor. They could send a telegram with only the defendant's name upon it, and the plaintiffs would know it was from them, and also know, or the jury was justified in so believing, that the margins required had been paid by the defendant to them, because, without any communication from the defendant, they would acknowledge receipt from him through these agents of the payments he made. Testimony for the plaintiffs discloses that they expected to pay for the services performed by Kellner & Vincent. Their testimony further shows that they were insisting that defendant pay the balance they are now suing for to these very agents.

[3] If Kellner & Vincent were their agents, it is unnecessary to inquire further as to the intention of the plaintiffs themselves, because they would be bound by the intention of their agents. It was very clear, from the testimony of Kellner, one of the agents, that he knew the defendant was speculating on the rise and fall of the cotton market, and was neither able to, nor intended to, accept delivery of cotton, and that it was not the intention or expectation of his firm to do other than what the defendant was doing. But, in the light of common knowledge of what is daily taking place about us, it is not difficult to understand how a jury could reasonably have believed that the plaintiffs were also intentionally entering into wagering contracts. Their letters reviewing the effects of the war upon the price of cotton, and notifying defendant of the fluctuations on the Exchange, their references to the market as "nervous" and "erratic," and as being affected by letters written at the State Department at Washington, their advices to "cover," are not consistent with the idea that they were intending to secure the delivery of cotton to the defendant. If the defendant really intended to buy or sell cotton, and accept or deliver it when the time came to do so, he would not have been much concerned about fluctuations in the price which were taking place in the meantime.

Cases of almost, if not exactly, this nature have been before this court heretofore, and it has been held, under evidence similar to that here submitted, that the good faith of transactions of this character is to be determined by the jury, and that usually it is not proper to instruct verdicts for those who claim to be only agents or brokers in the placing of such contracts. Williamson v. Majors, 169 Fed. 754, 95 C. C. A. 186; James v. Clement, 223 Fed. 385, 138 C. C. A. 621.

There is no question of law presented as to the rights of parties under contracts of this kind. We are of opinion that the case was properly submitted to the jury, and the judgment is therefore affirmed.